**Guttorm ODDENES, Plaintiff,**

**v.**

**UNIVERSE TANKSHIPS, INC.,**
**Defendant.**

United States District Court
S. D. New York.

Oct. 27, 1960.

———◇———

Jacob Rassner, New York City, for plaintiff.

Bigham, Englar, Jones & Houston, New York City, for defendant, John L. Quinlan, John B. Shields, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff, a seaman on the S. S. Petro Emperor, sues the owner of the vessel to recover for personal injuries sustained aboard her on August 4, 1958.

The case was tried to the court without a jury.

Plaintiff is a Norwegian national. The Petro Emperor is a Liberian flag tanker and defendant owner is a Liberian corporation. Plaintiff signed aboard the vessel in Portland, Maine. The accident occurred while she was docking in Halifax Harbor, Nova Scotia. The parties have stipulated that the case is governed by the non-statutory general maritime law of the United States.

### 1. Liability

Plaintiff Oddenes, who had been at sea since 1944 and held Norwegian mate's and master's licenses, was the second officer of the Petro Emperor, a thirty-five thousand ton tanker. On September 4, 1958 she was being docked at Imperial Oil Dock No. 5 in Halifax Harbor. It was clear and calm.

The Imperial dock was a finger dock which ran parallel to the shore. Three tugs were setting the ship into the dock broadside. Her propellers were not turning and she was dead in the water. The master and the pilot were on the bridge directing the docking. Oddenes, as second officer, was stationed at the stern in charge of the aft lines. There were three aft lines to be put out—a spring line, a breast line and a stern line.

Oddenes received directions from the master as to the rigging of the stern lines. He was told by the master in the pilot's presence that the aft spring line was to be put out from the main deck and a breast line from the poop deck. This meant that the eight inch hawser of the spring line would run from the starboard gypsy head of the heaving winch at the aft end of the poop deck around a fair lead directly aft of the gypsy head; then to starboard and around bitts several feet inboard of the starboard rail; then forward and outboard through a chock on the starboard side of the poop deck; then forward and back inboard under the ship's rail on to the poop deck; then forward for some 60 feet along the starboard passageway outboard of the poop deck housing; then over a rubbing bar at the forward edge of the poop deck and down to the main or well deck eight feet below, and finally around bits on the main deck and out through a closed chock on the starboard edge of the main deck. From there it ran a considerable distance forward to the dock where it was made fast to a cleat or bollard.

Oddenes questioned the rigging of the spring line from the main deck and suggested to the master that it ought instead to run directly out from the chock on the

poop deck and then forward to the dock. Had this suggestion been followed it would have eliminated the necessity for the complicated rigging which was entailed in putting the line out from the main deck. It would not have been necessary to bring the spring line inboard again after it had passed outboard through the poop deck chock and then forward down the 60 feet of passageway over the forward edge of the poop deck down to the main deck and around the main deck bitts and out the main deck chock. However, the master rejected Oddenes' suggestion and told him to put the spring line out from the main deck as he had ordered. Oddenes obeyed these instructions.

Two other physical facts should be noted.

The chock on the poop deck through which the spring line hawser ran was a double chock, the aft section of which was closed and the forward section open. The spring line was run through the open section of the poop deck chock, the closed section being reserved for the breast line. About half way down the starboard passageway along the poop deck there were two upright metal pipes running from the deck to the top of the passageway close to the poop deck housing. Whether they contained electric wiring or were vents is not clear.

When the vessel was some 30 feet from the dock the spring line rigged in the manner described was made fast to the dock. A bow line had also been made fast. On orders from the bridge heaving began on these two lines. When the ship was about 15 feet from the dock the bridge ordered heaving on the aft spring line to cease. When she was about 8 feet from the dock heaving was ordered resumed. As the slack was being taken up the portion of spring line in the starboard poop deck passageway began to jump or bounce. As the hawser became taut it slipped out of the open chock on the poop deck and tore away a section of the rail.

Oddenes was standing on the poop deck just aft of the housing in a position from which he could observe both his winchman at the gypsy head aft of the poop deck housing and the spring line running down the length of the poop deck passage. He was within the bight of the spring line. As the hawser slipped out of the chock and smashed through the rail it struck him with great force and he was severely injured.

There is no dispute as to how the spring line was rigged, or, indeed, as to how the accident happened. While there was some dispute as to whether the master specifically ordered the spring line put out from the main or well deck, I find from the evidence that this was understood both by the master and Oddenes. Moreover, the master could observe from the bridge the manner in which the spring line was rigged and gave no indication that the rigging was not satisfactory or in accordance with his orders. The main controversy arises as to whether or not the manner in which the spring line was rigged as directed by the master was safe, proper and seaworthy.

Plaintiff seeks to hold the defendant shipowner liable for his injuries on several theories.

First, plaintiff contends that the ship was unseaworthy because there should have been a roller rather than a rubbing bar at the forward edge of the poop deck where the spring line hawser was led down to the main deck below. This, plaintiff urges, would have made the hawser run more smoothly as it was being heaved in and would have prevented it from jumping and slipping out of the open chock on the poop deck when it was made taut.

There is no merit to this contention. Plaintiff failed to show that a rubbing bar was not a usual, safe and approved appliance. Indeed, there is testimony to the contrary which I accept.

Secondly, plaintiff urges that the presence of the upright pipes close to the poop deck housing in the poop deck starboard passageway made the ship unseaworthy since they required that the spring line be rigged through the poop deck chock in

order to avoid rubbing against the pipes and damaging them. This contention is likewise without merit. It is plain that the spring line would have been rigged in the same manner even had the pipes not been present so as to avoid rubbing or chafing against the poop deck housing. Even had it been shown (and it was not) that the presence of the pipes was not usual or proper, they still could not have been a contributing factor to the accident which occurred.

Third, plaintiff contends that the ship was unseaworthy because the master was not reasonably fit for his calling. This claim is based on the theory that it was bad seamanship for the master to order the spring line put out from the main deck instead of the poop deck since this required the rigging of the spring line in a necessarily dangerous and unseaworthy manner.

There is no evidence that the master was not fully competent and qualified. Indeed, with the exception of the controversial order issued in connection with this docking, plaintiff concedes, for all practical purposes, that the captain was generally competent and qualified. In essence, the plaintiff's claim is that the order to put out the line from the main deck was negligent and improvident. Assuming this to be so, it is too well-settled to require discussion that, under the general maritime law, a shipowner is not liable to a seaman for injuries resulting from the negligence of the master. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; John A. Roebling's Sons Co. v. Erickson, 2 Cir., 261 F. 986, certiorari denied 252 U.S. 585, 40 S.Ct. 394, 64 L.Ed. 729; Penedo Cia Naviera S. A. v. Maniatis, 4 Cir., 262 F.2d 284.

This brings us to the key question of liability—whether or not the rigging of the spring line necessitated by the master's order to put the line out from the main deck created a dangerous and unseaworthy condition for which the shipowner was liable.

Captain Wood, recently retired senior captain of the Gulf Oil Company Fleet, testified as an expert witness for the plaintiff. Captain Wood had had more than forty years' experience at sea from the deck up and wide experience on tankers. He had commanded tankers for many years, and his last command was a tanker of comparable size to the Petro Emperor. He was fully competent to give expert opinion on the master's order to put out the spring line and the rigging which was required to carry it out.

In Captain Wood's opinion, given the order by the master to put the spring line out of the main or well deck, which Oddenes was required to follow, Oddenes rigged the spring line properly and in the only way he could have under the circumstances. Wood was also of the opinion that it was bad seamanship for the master to issue the order to put the spring line out of the main deck. One of the factors on which he based his opinion was the very complicated nature of the rigging required to carry out the order. Wood said that good seamanship required that the spring line be put out from the chock on the poop deck, as Oddenes had himself suggested, rather than from the main deck. Wood's testimony was uncontradicted.

The rigging of the spring line required by the captain's order was very complicated. The line could not be run directly from the winch at the gypsy head along the poop deck forward. This would have resulted in the line chafing against the poop deck housing, quite apart from the effect it might have had on the upright metal pipes which projected from the poop deck housing. This would not have been avoided if the line had been placed around the fair lead aft of the starboard gypsy head, or around the bitts inboard of the starboard rail also. In order to avoid rubbing of the eight inch hawser it was necessary to take the line forward and outboard through the poop deck chock and then lead it back inboard under the rail, as was done. From this point forward there was 60 feet to go along the starboard passageway and the line then

had to be led over the forward edge of the poop deck down to the main deck 8 feet below and then again around bitts and out through the main deck chock.

The order to put the line out from the main deck which required rigging in this manner had been objected to by Oddenes, a licensed master himself, who also testified without contradiction that the order was unseamanlike and was likely to result in a dangerous condition. Oddenes had no choice but to obey the master's order. There was grave danger under the circumstances that the spring line so rigged would come out of the chock when slack was taken up and heaving resumed. The resulting condition was dangerous to anyone in the vicinity.

Such dangerous rigging was not required by the exigencies of docking the vessel. Indeed, as Captain Wood testified, if the spring line had been run off the poop deck the operation of heaving the vessel in could have been carried out more efficiently. If when the ship was hove into the dock it was desirable to have the spring line run out of the main deck it could have been transferred to the main deck and made fast without difficulty.

Thus, the dangerous condition which arose during the heaving operation because of the complicated rigging of the spring line could easily have been avoided. The master himself, who, no doubt, was familiar with what his order required and who observed the rigging of the line from the bridge, should have been aware of the dangers and should not have directed that the spring line be put out of the main deck under the circumstances.

 I find that the manner in which the spring line was rigged created a condition dangerous to seamen working on the poop deck and that this condition rendered the spring line as rigged unseaworthy. I further find that this dangerous and unseaworthy condition was a direct result of the order issued by the master to have the spring line put out from the main deck. I also find that this unseaworthy condition was a proximate cause of the plaintiff's accident and his resulting injuries.

 It is urged that the condition which was created by the rigging of the spring line was merely temporary and so transitory as not to give rise to liability. But the duty of the shipowner to provide a seaworthy vessel is absolute. The duty is no less onerous with respect to an unseaworthy condition which may be only temporary. Liability for a temporary unseaworthy condition is no different from the liability that attaches when the condition is permanent. This is settled by the recent decision of the Supreme Court in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, which expressly so held. See, also, Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

 The rigging here was not reasonably fit for its intended use in heaving the vessel into the dock since it was dangerous and likely to lead to the injury of seamen concerned with the operation. By creating such a condition through the orders of the master the owner breached its absolute duty to furnish a seaworthy vessel and is liable to the plaintiff seaman for the injuries which he suffered in consequence.

## 2. Contributory Negligence

Defendant asserts that even if there was an unseaworthy condition the plaintiff himself was negligent and the accident was either caused by the plaintiff's negligence or such negligence contributed to its occurrence.

 It is well-settled that even though where, as here, liability is based solely on unseaworthiness rather than negligence, the amount of damages which plaintiff suffered must be reduced in the proportion that plaintiff's own fault contributed to the happening of the accident. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, n. 11, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Tallbot v. Hawn, 346 U.S. 406, 415, 74 S.Ct. 202, 98 L.Ed. 143 (concurring opinion of Frankfurter, J.);

Ross v. Steamship Zeeland, 4 Cir., 240 F.2d 820.

Defendant urges that plaintiff was negligent in three respects.

First, it says that it was Oddenes himself who supervised the rigging of the spring line and that the accident was caused by the manner in which it was rigged. Oddenes was not only a licensed mate but also a licensed master and should have rigged the spring line properly. Therefore, defendant argues, Oddenes was himself responsible for the accident or, at the least, his negligence contributed to it.

As I have found, Oddenes was ordered by the master to put out the spring line from the main deck after he had protested that it should have been put out from the poop deck. Oddenes was plainly required to follow the captain's order. In order to follow the order it was necessary to rig the spring line in the manner in which it was rigged. Captain Wood testified that given the master's order the rigging of the spring line was seamanlike and proper and this was the only way it could have been done. I find that Oddenes was not negligent in rigging the spring line as he did.

Secondly, defendant claims that Oddenes was negligent in using the open poop deck chock to lead the spring line outboard and back inboard onto the deck instead of the adjacent closed chock. It says that the spring line could not have slipped out of the closed chock had that chock been used, and that in such case the accident would not have occurred.

However, under the master's orders the breast line was also to go out from the poop deck. Oddenes said that he did not put the spring line through the closed chock because that was reserved for the breast line, and that the presence of the spring line in the closed chock would have interfered with the breast line and tended to jam both lines. This was Wood's opinion also. In Wood's view it was not bad seamanship for Oddenes to use the open chock for the spring line and reserve the closed chock for the breast line under all the circumstances. I find that Od-

denes was not negligent in using the open chock under the circumstances.

Finally, defendant urges that Oddenes was negligent in standing within the bight of the spring line at the time the accident occurred. Oddenes admitted that it was bad seamanship to stand in the bight of a line and that this exposed him to danger. This was plainly so.

Oddenes claimed that he stood where he did in order to be able to observe the man stationed at the telephone, the winchman and the action of the line running down the poop deck passageway. However, he failed to show that it was necessary to stand in the bight of the line in order to perform his duties properly or that another and less dangerous position would not have been just as suitable.

I find that Oddenes was negligent in standing within the bight of the spring line and that his negligence was also a proximate cause of the accident. While there are no precise standards which can be applied to determine the proportion in which a plaintiff's negligence contributes to the happening of an accident, under all the circumstances of this case I find that the plaintiff's fault contributed to the accident to the extent of 35%. The defendant will therefore be liable only for 65% of the damages suffered by the plaintiff.

## 3. Damages

There is no doubt that the plaintiff was severely injured. The heavy 8 inch hawser struck him with great force, spun him around and knocked him to the deck. He had fractures of the second and third transverse processes of the lumbar spine, a fracture of the fibula of the right leg, tearing of ligaments of the right knee, lacerations of the head and back, some of which required sutures, and various bruises.

He was in the Camp Hill Hospital in Halifax for some 84 days. His leg was in a cast for some two months. When he left that hospital the fractures to his leg and spine were well on the way to healing. However, there still remained a disability of the right knee due to the

torn ligaments. He then came to New York and was in the Hospital for Joint Diseases for some 26 days where surgery was performed on his right knee directed at the repair of the torn ligaments. Wire sutures were inserted.

Up to the time of the trial the plaintiff had not returned to work. There were several medical examinations of the plaintiff in the interim with somewhat conflicting results. It appears that the plaintiff was partially disabled because of the condition of his knee up to the time of the trial.

On the last day of the trial Oddenes was examined pursuant to stipulation by Dr. McElroy, an orthopedist of reputation and standing, called by the defendant, in the presence of counsel for both parties. Dr. McElroy's findings were not seriously questioned by the plaintiff. In my view they are completely reliable and I accept them.

Dr. McElroy found that Oddenes was then able to return to sea. This was in accordance with the prognosis made by Dr. Stinchfield, a leading orthopedist, some nine months before that he would be "able to return to sea duty within six to twelve months". However, there still remained a residual instability of the right knee. Dr. McElroy recommended a course of exercises to be taken for some six months designed to strengthen this condition. However, he anticipated that there would be some permanent instability which could not be cured by exercise.

Motion pictures taken of plaintiff during the trial showed him climbing up and down ladders while painting a store front for a friend. They not only confirm the opinion of Dr. McElroy that he was able to return to sea but indicate that he could have done so at least by the date when the trial commenced, which was February 3, 1960.

██ I therefore find that plaintiff was able to resume sea duty as of then. Since his wages were paid until December 4, 1958 he is entitled to recover the wages lost from that date until February 3, 1960, which, at the rate of $400 per month, amount to $5,600. I will award him the sum of $27,500 for his pain and suffering and for the future effects of permanent instability of his right knee which resulted from the accident. Plaintiff failed to establish his claim that the instability would handicap him in obtaining berths as mate or master, or would result in any future loss of earnings.

Thus, plaintiff's damages amounted to the sum of $33,100. In view of his contributory negligence of 35% plaintiff is entitled to recover only 65% of that sum, or $21,515.

In addition, plaintiff is entitled to maintenance and cure at the stipulated rate of $9 per day from March 16, 1959, when payment of maintenance was discontinued, until February 3, 1960, or a total of $2,916.

Plaintiff will therefore have judgment against defendant in the total sum of $24,431.

Judgment will be entered accordingly.

The foregoing opinion constitutes my findings of fact and conclusions of law.