Fred G. SALEEBY, Plaintiff,

v.

KINGSWAY TANKERS, INC., Defendant
and Third Party Plaintiff,

v.

BAILEY REFRIGERATION CO., INC.,
Third Party Defendant.

No. 77 Civ. 3691 (IBC).

United States District Court,
S. D. New York.

Aug. 18, 1981.

Steven Thaler, Trial Counsel for Markowitz & Glanstein, New York City, for plaintiff.

Cichanowicz & Callen, New York City, for defendant Kingsway Tankers, Inc.; Victor S. Cichanowicz, New York City, of counsel.

## OPINION

IRVING BEN COOPER, Senior District Judge.

On November 18, 1980 the jury delivered a verdict in favor of the plaintiff for $1,510,705 on the two theories of liability submitted to it for determination: unseaworthiness and violation of the Jones Act, 46 U.S.C. § 688.[1] Pursuant to special interrogatories submitted to it, the jury determined that the plaintiff was 15% contributorily negligent; that of the entire general verdict, past and future medical expenses amounted to $263,000.

The defendant now seeks to be relieved of the verdict by moving for judgment notwithstanding the verdict and alternatively for a new trial. The defendant's position is: (1) that the verdict is contrary to the evidence and law; (2) that the verdict is against the weight of the evidence and as such reflects an improper rather than a reasonable appraisal of the evidence. For his part, the plaintiff insists that the total trial record and the law applicable thereto firmly supports the jury's verdict.

### The Facts

Plaintiff, Fred Saleeby (Saleeby), commenced his employment as the chief engineer aboard defendant's ship, the T.T. Williamsburg, on August 24, 1974. After two voyages and a nine month vacation, Saleeby rejoined the ship while it was undergoing repairs at the Verlome Shipyard in Rotterdam, Holland on February 23, 1976. It was there that he first learned from the ship's chief steward that the on-board food freezer (the meat box) was not defrosting properly causing ice to accumulate in the meat box and on the surrounding deck.

The meat box itself was approximately 20' × 13' × 8' in dimension and was principally used to store food for the crew. It came equipped with an automatic defroster unit which included freon coils, heating coils, a diffuser pan, drain lines and a fan. The problem with the meat box was that certain heating coils in the diffuser and diffuser pan were defective.

When the automatic defroster unit was activated, the accumulated ice would begin to melt and drain into the diffuser pan and drain line. The water in the pan and drain line would then turn to ice because the heating coils were not working. Eventually, the ice-blocked drain line would cause an overflow of water to accumulate on the deck, diffuser and freon coils—all of which rapidly turned into ice. Because the diffuser and freon coils were covered with ice, no refrigerated air generated from the fan could enter the meat box. Thus, the temperature in the meat box would rise and endanger the food contained therein.

Shortly after Saleeby learned of this problem, he spoke with Thomas Keenan, the port engineer in charge of repairs aboard the T.T. Williamsburg while it was in the Verlome Shipyard in Holland. Subsequent to inspection of the meat box and an unavailing search for spare parts, Keenan directed Saleeby to manually defrost the meat box when the ship set sail, and to order parts through the home office. In due course, Saleeby notified the captain of the Williamsburg of the meat box deficiency.

---

1. The third party claim against Bailey Refrigeration Co., Inc. was dismissed during trial.

The vessel sailed from Holland bound for the Persian Gulf on March 14, 1976 without the needed parts. A number of attempts at getting the parts then ensued. A requisition dated April 25, 1976 for the parts was sent to the home office; two cablegrams dated June 23 and July 27, 1976 were sent by the captain to Avon Marine (agent of Anndep Steamship Company, the managing agent for the Williamsburg); Saleeby spoke to Mr. Bentsen, president of Nova Marine Co., a spare parts company, as well as with Keenan again in June 1976. Nothing helpful resulted from these requests.

Throughout this entire period (after the ship sailed from Holland) the meat box was attended to by Walter Seales, 1st assistant engineer; to a lesser extent by Alfred Case and Rufus Cobb, both 2nd assistant engineers; Saleeby and others. The actual procedure they employed in manually defrosting was to shut down the refrigeration equipment; remove the food from the meat box; drag in a hot water hose used to melt the ice from, among other places, in front of and behind the diffuser; and finally remove the ice from the meat box and surrounding deck area. The entire procedure took from 30 to 45 minutes.

On September 7, 1976, Saleeby, after checking the daily noon log, noticed from the entries therein that the temperature in the meat box was rising. He decided to defrost the meat box. He notified the 3d assistant engineer and proceeded to shut down the refrigeration equipment. He managed to get behind the diffuser unit by climbing over the drain line and under the diffuser. He then opened the vents on the back wall and began melting the ice. Once all the ice in back of the diffuser melted, Saleeby started to return to the front of the diffuser. He got both feet back across the drain line and was just about to stand up when he slipped and fell.

As to the jury's finding of 15% contributory negligence, it may have been influenced by Saleeby's testimony on cross-examination that he did not have to climb behind the diffuser unit to defrost the meat box.[2] He could have remained in front of the unit and simply sprayed the hot water behind it. We note in passing that although we will not recalculate the jury's finding as to Saleeby's contributory negligence, the 15% which the jury found is the absolute minimum we would let stand.

\* \* \* \*

■ Initially, we reject in toto any contention which the moving papers set forth on the issue of liability. Both quantitatively and qualitatively, the fair preponderance of the credible evidence adduced during this trial supports the jury's verdict as to liability.

Viewing the evidence in the light most favorable to Saleeby, it is "... so strongly and overwhelmingly in favor of [him] that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against [him]." *Bernardini v. Rederi A/B Saturnus*, 512 F.2d 660, 662 (2d Cir. 1975). *See also* 5A Moore's Federal Practice ¶ 50.07[2] at 79–83. Therefore, we deny the motion for judgment n.o.v. in all respects.

We also disagree with the defendant that plaintiff breached a duty owing to his employer. The "*Walker*" doctrine, *Walker v. Lykes Bros. Steamship Co.*, 193 F.2d 772 (2d Cir. 1952), although to date not overruled, has repeatedly been unavailing to defendants in our Circuit's Court of Appeals. *See Johannessen v. Gulf Trading*, 633 F.2d 653, 655 n.3 (2d Cir. 1980); *Berke v. Lehigh*, 435 F.2d 1073 (2d Cir.), *cert. denied*, 404 U.S.

2. Plaintiff, on cross examination:

Q. ... [C]ouldn't you stand out in front of the diffuser and spray the water on the front of it and the ice in the back would fall off?
A. It would be the same thing, yes, sir.
Q. But you elected to go behind it, right?
A. I had to do both sides, either way, yes, sir.
Q. But you could have by standing in front and melting the ice off the front and spraying the water through the defuser you could have melted the ice off the back, right?
A. Yes, sir. I would have the same situation.
Q. If it fell off the front of it would fall off the back, is that right?
A. Yes, sir.
(Trial Transcript, hereinafter "T.T.," 433–34)

825, 92 S.Ct. 55, 30 L.Ed.2d 53 (1970); *Dunbar v. DuBois' Sons Co.*, 275 F.2d 304, 306 (2d Cir.), *cert. denied*, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960); 1B Benedict on Admiralty, § 25, n.28 (7th Edition, 1980).

## Medical Attention

For our purposes here, we need not review Saleeby's long medical history prior to his accident on September 7, 1976 except to say that since his childhood he had developed dorsolumbar scoliosis and kyphosis (sometimes referred to as kyphoscoliosis) which caused what was described at trial as an "S" shaped curvature of the spinal column and a moderate rounding or humping of the back; all of which had stabilized well before the time of the accident involved herein.[3]

Saleeby's medical problems began almost immediately after his accident. The captain of the Williamsburg confined Saleeby to his quarters and gave him pain pills.[4] Shortly thereafter Saleeby was helicoptered to a hospital in Durban, South Africa; about 10 days later he was repatriated to this country where he sought the treatment of Drs. Hicks and Piggott.[5] Dr. Piggott determined that Saleeby had done damage to his back and spine as Saleeby's flexion and extension were greatly reduced. After a short period of bed rest and traction at home, Saleeby was admitted to McLeod Hospital on September 26, 1976. Shortly thereafter and subsequent to a medical work-up, Dr. Hicks declared that Saleeby had a contused kidney which resulted in hematuria.[6]

In October, 1976 Saleeby was admitted to Roper Hospital for "conservative" care. Dr. Barone, a neurosurgeon there, found that Saleeby had numbness and pain in his left leg as well as lower back pain.[7] In December, 1976 Saleeby was again readmitted to Roper Hospital with the same complaints and was given medication, physical therapy and traction.

During 1977, Saleeby was admitted on three separate occasions to Duke Hospital under the care of Drs. Erwin and Nashold. After a battery of tests and therapy which included biofeedback, no improvement in Saleeby's condition was noted. An epidermal dorsal column stimulator was inserted, a portion of which was beneath Saleeby's skin, to help bypass some of the pain in his back and down the left leg.[8] By then, Dr. Nashold had also determined that Saleeby had chronic nerve root irritation of the lumbar 5 nerve root and needed to have a pacemaker implanted in lieu of any further use of the stimulator.[9]

In 1978 Saleeby had the pacemaker implanted at Duke Hospital in the hope of eliminating or reducing his pain. The pacemaker remained operational for only three months and this necessitated two follow-up operations. It was during the second such operation that Saleeby developed marked hypoxia as a result of complications from the anesthesia used.[10] The marked hypoxia caused permanent damage to Saleeby's heart and lung.

Saleeby again saw Drs. Hicks and Nashold in 1979 and 1980 complaining of shortness of breath and weakness in the left leg. After a full heart work-up at Duke Hospital, it was determined that Saleeby had permanent nerve damage, slight scarring of the right lung and atrophy of the left thigh.[11]

The parties have agreed as to past medical expenses up to and including the date of

3. Plaintiff's Exhibit 47, pp. 5–8; 14, 23, 38–40; 53; 58; 89–90; Plaintiff's Exhibit 48, pp. 21–22, 35, 44–45.

4. T.T. 85, 86, 119, 120.

5. T.T. 86, 130, 208–09.

6. Plaintiff's Exhibit 47, pp. 37–43; 63; Plaintiff's Exhibit 48, p. 11.

7. Plaintiff's Exhibit 47, pp. 52–53.

8. T.T. 140, 155–59, 163–68, 217, 312; Plaintiff's Exhibit 47, pp. 68–73.

9. T.T. 307, 313.

10. T.T. 315–17; Plaintiff's Exhibit 48, pp. 20–22, 25–26.

11. T.T. 315–17; Plaintiff's Exhibit 48, pp. 30–35.

trial.[12] The defendant has paid certain of these expenses amounting to $3,642.38; the claimed unpaid balance is $33,783.46.

As to future medical expenses, there was some conflicting testimony. According to Dr. Balensweig, defendant's doctor, who examined Saleeby twice before trial, "... [Saleeby] reached maximum of active medical care...." On the other hand, Dr. Hicks, plaintiff's internist, testified that Saleeby would incur future expenses for medical attention, for Dr. Hicks planned to see him every two months on a permanent basis assuming "no further aggravation or exacerbation of Saleeby's present condition." The cost for Dr. Hicks' services would be $200 per year. Dr. Hicks also stated that Saleeby would need medication for the rest of his life, but was unable to estimate its cost.[13] The total future cost for Dr. Hicks' professional services then, assuming Saleeby reached the maximum of his life expectancy, is $4,400.

Further, Dr. Nashold (plaintiff's neurosurgeon) testified that he felt Saleeby would require follow-up care; that Saleeby would require medication in the future; that further surgery would be required only if the pacemaker malfunctioned or some new medical breakthrough developed. The only testimony by Dr. Nashold as to actual costs related to the replacement of the pacemaker. If such surgery eventuated, the costs would be: $3,000 for a new device; $5-10,000 for hospitalization; and "several thousand dollars" for doctor's bills.[14]

Assuming that a future operation will be required, the maximum amount attributable to this aspect of further medical expenses is $17,000.

Finally, Dr. Piggott (plaintiff's orthopedist) testified that he believed Saleeby would continue under the intermittent care of physicians at Duke hospital, although he was uncertain as to what specific arrangements Saleeby had made. Dr. Piggott thought that there might be a possibility of future surgery for further implantation or adjustment of the pacemaker; that in that event, he would see Saleeby for follow-up care at $10 per visit.[15]

Here again, assuming the eventuality of an operation and that Saleeby will see Dr. Piggott several times a year over the period of Saleeby's life expectancy, the maximum of future medical expenses payable to Dr. Piggott is approximately $1,100.

What we have recited on the issue of damages relating to medical attention accorded plaintiff, as well as expenses related thereto, constitutes the highlights of proof most favorable to him throughout the total trial record.

\* \* \* \*

■ The law on medical expenses for an injured seaman is clear. "In the event of liability of the shipowner on the ... unseaworthiness claims the injured seaman is entitled to recover indemnity ... for medical expenses reasonably incurred in the past and to be incurred in the future...." *Bartholomew v. Universe Tankers*, 279 F.2d 911, 916 (2d Cir. 1960). Alternatively, "[r]ecovery of medical expenses in a Jones Act case is not prohibited as long as plaintiff is not permitted an additional recovery for the same expenses under a count for maintenance and cure." *Butwinski v. Penn. R.R. Co.*, 249 F.2d 644, 645 (2d Cir. 1957). *See also Fitzgerald v. United States Lines*, 374 U.S. 16, 19–20, 83 S.Ct. 1646, 1649–50, 10 L.Ed.2d 720 (1963); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 533 (9th Cir. 1962); *Krey v. United States*, 123 F.2d 1008, 1010 (2d Cir. 1941); *Roe-*

---

12. T.T. 1109–10; Plaintiff's Exhibit 50:

| | |
|---|---|
| McLeod Hospital | $ 579.00 |
| Roper Hospital | 1,955.50 |
| Duke Hospital and Doctors at Duke | 31,425.84 |
| Dr. Hicks | 650.00 |
| Dr. Piggott | 444.00 |
| Dr. Barone | 542.00 |
| Medication and Physical Therapy | 1,544.33 |

13. Plaintiff's Exhibit 48, pp. 37–38.

14. T.T. 317; 324–25.

15. Plaintiff's Exhibit 47, pp. 86; 88; Exhibit 1 attached thereto.

*bling's Sons Co. v. Erickson*, 261 F. 986, 987 (2d Cir. 1919).

■ Equally axiomatic is that plaintiff has the burden of proving every element of his claim including medical expenses, and of reducing or eliminating by credible proof any speculation or uncertainty as to future medical expenses so that a jury, when applying the fair preponderance of the credible evidence test, may fairly evaluate the evidence.

The evidence adduced on medical expenses (see "Medical Attention", *supra*) did not prove that Saleeby was entitled to $263,000 ($309,411 before the 15% reduction for contributory negligence). When viewing the evidence adduced most favorably to Saleeby and given the fact that the jury found him 15% contributorily negligent, the maximum which the jury could have allocated for past and future medical expenses was $48,000. That evidence is worthy of brief repetition.

The stipulated amount of unpaid past medical expenses was $33,783.46. Dr. Hicks (plaintiff's internist) stated that he would have to see Saleeby in the future at a cost of $200 per year or a total of $4,400. Dr. Nashold (plaintiff's neurosurgeon) testified that if the pacemaker broke down, further surgery would be required. The costs involved there would be $3,000 for a new pacemaker; $5,000–$10,000 for an operation; and several thousand dollars for doctor bills. The total would be $17,000. Dr. Piggott (plaintiff's orthopedist) testified that he will be seeing Saleeby "as necessary" at $10 per visit for a total of approximately $1,100.[16]

The balance of the verdict on medical expenses is devoid of any factual support from the total trial record.

What we are confronted with here is a well-meaning jury (we told them so) which drastically erred in its evaluation of the evidence adduced on medical expenses so as to more than "shock or outrage our judicial conscience." A jury's discretion in the assessment of damages is wide—not wild. The run-away approach to damages of this jury is best exemplified not only by its unsupported assessment of medical expenses but also by the totality of the verdict it rendered before reduction for contributory negligence ($1,777,300).

Plainly speaking, this jury's grievous error has shaken our confidence with respect to the entire verdict it rendered. This is not a situation where "... we find nothing untoward, inordinate, unreasonable, or outrageous—nothing indicative of a runaway jury, one that lost its head—in its reflected resolution to so respond." *Grunenthal v. Long Island Railroad*, 292 F.Supp. 813, 816 (S.D.N.Y.), aff'd in part, remanded in part, 388 F.2d 480 (2d Cir.), *rev'd*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968) (jury's verdict reinstated). Quite the opposite is true here.

### Estimated Income

The proof adduced on wages (past, present and future) falls into two categories of Saleeby's employment: as chief engineer and as a consultant. He testified that he worked as a chief engineer since 1958.[17] Additionally, that his per day work record from 1960 to the date of the injury was above average.[18] Saleeby further testified he had not performed work of any kind since September 7, 1976.[18A]

Mr. Powers, a representative for District 2, Marine Engineers Beneficial Association (of which Saleeby was a member) described the rate at which a chief engineer was paid from 1976 until 1980. For a vessel between 100,000 and 200,000 gross tons, a chief engineer was paid a monthly base wage; a

---

**16.** Plaintiff's Exhibit 47, pp. 86, 88; Exhibit 1 attached thereto.

**17.** T.T. 19, 20.

**18.** T.T. 237–38: 1960–310 days; 1961–191 days; 1962–247 days; 1963–200 days; 1964–191 days; 1965–330 days; 1966–214 days; 1967–184 days; 1968–262 days; 1969–288 days; 1970–243 days; 1971–215 days; 1972–212 days; 1973–284 days; 1974–214 days; 1975–245 days; 1976–192 days. Saleeby said this was within 1 or 2 days either way.

**18A.** T.T. 237–38.

monthly non-watch differential; a minimum of 25 hours per month overtime at a fixed hourly rate; and for every day of work, one day's paid vacation determined by the aggregate of the monthly base wage and non-watch differential in effect at that time.[19] We note the monthly base wage, non-watch differential and overtime rates.[20]

Dr. Berenson, an economist called by the plaintiff, testified as to Saleeby's actual and projected loss of wages as a chief engineer. He based his testimony in part on the information Mr. Powers supplied to him. Dr. Berenson stated that because of accumulated vacation time as of the date of injury, Saleeby's economic injury as a chief engineer was calculated from July 3, 1977. Dr. Berenson testified as to the factors he used in determining loss of wages:[21] He first determined from appropriate Bureau of Labor statistics tables that Saleeby's work life expectancy was 12.6 years; that the pretrial period amounted to 3.24 years because Saleeby had accumulated vacation pay at the date of injury; that by adding the individual components of Saleeby's monthly pay schedule, he arrived at the monthly wages (with increments received over time) of Saleeby through October, 1980; that during the pretrial period (July 3, 1977 through October, 1980) and assuming six (6) months employment per year, Saleeby would have earned $164,589.

As to future wages, the witness made a "flat projection"[22] by simply multiplying the most current monthly wage rate (June 16, 1980) by plaintiff's work life expectancy of 12.6 years; that he divided that sum by two to account for six (6) months employment per year; that the future wage loss was $807,230 and the total wage loss (past, present and future) amounted to $971,819.

Concluding the proof on this element of damage, Mr. Powers, plaintiff's union agent, testified that work was available for a chief engineer aboard vessels which were in the same class as the Williamsburg.[23] Further, that when the Williamsburg was "laid up," Saleeby had the right, as is customary in the industry, to work aboard the Williamsburg's sister ships.[24]

Saleeby also testified that during his vacation time in 1973, 1974 and 1975 he had done some supplementary "consulting" work for Seatrain Shipbuilders (Hudson Waterways). The nature of that work involved observing and reporting defective equipment aboard the vessel to which he was assigned.[25] Plaintiff testified that his earnings as a consultant were $7,100 for a period from October 15 to December 31, 1973; $11,300 for the period May 1 to August 23, 1974; $10,300 for the periods from August 1 to August 30 and October 10 to December 23, 1975.[26]

19. T.T. 612–15.

20. *Id.*

| Date | Base | Non–watch | Hourly Overtime |
|------|------|-----------|-----------------|
| June 16, 1976 | $2378.73 | $666.06 | $20.58 |
| December 6, 1976 | $2426.30 | $679.38 | $20.99 |
| June 16, 1977 | $2644.67 | $747.52 | $22.82 |
| December 16, 1977 | $2697.56 | $755.33 | $23.34 |
| June 16, 1978 | $2899.88 | $811.98 | $25.09 |
| June 16, 1979 | $3218.87 | $901.30 | $27.85 |
| December 16, 1979 | $3347.62 | $937.15 | $28.96 |
| June 16, 1980 | $3844.07 | $1076.36 | $33.25 |

21. T.T. 630–34.

22. He testified: "... The total payments, had he continued to work at the rate of six months per year, would have been $164,589. In addition to the total earnings in this 3.24 pretrial period we have the remainder of his work life expectancy, which I indicated to you several moments ago was 12.6 years. If we take what we call a flat projection, simply multiply today's base rate with its overtime and nonwatch and vacation, that is the $10,677.65 per month, you multiply that for 12.6 years and six months each year, we get a total of $807,230. So that the total of all of these earnings in the pretrial and in the post-trial period comes out to be $971,819." (T.T. 630–34)

23. T.T. 615; 619.

24. *Id.*

25. T.T. 259–60; 295–300; 358–63; 365–67; 623–24.

26. Saleeby testified only about money earned in 1974 and 1975; 1973 information was obtained from Plaintiff's Supplemental Answers to Interrogatories, undated, p. 30, answer 20.

Dr. Berenson, plaintiff's economist, testified on this element of damages as well:[27] That the pretrial period for consulting wages was 4.1 years (as opposed to 3.24 years as the pretrial period for wages as a chief engineer) because Saleeby had no accumulated paid vacation time as a consultant; that the 12.6 year work life expectancy was equally applicable here; that for the 1973–75 period, Saleeby earned an average $36,651 *per year* as a consultant, which in 1980 dollars amounted to $51,334.67 per year; that his final step in this calculation was to multiply the average yearly amount by the pre and post trial period, assuming six (6) months employment per year; that the pretrial period of lost wages amounted to $105,236, the post trial period $371,922;[28] that the total for lost wages as a consultant was $477,158.

We are constrained to point out that witness Berenson's testimony is totally inaccurate on two vital issues relating to his estimate of lost wages as consultant. Firstly, he assumed that Saleeby worked six (6) months per year as a consultant. This constitutes plain error in light of Saleeby's own clear testimony (*supra*) that the longest he worked as a consultant during any one of the three years was three and one-half months. This error resulted in an enormously amplified computation by him on this score, especially when we consider that his projection covered Saleeby's entire work expectancy period subsequent to the date of injury. The impact on the jury of this weighty error, in all likelihood, was substantial.

Secondly, witness Berenson incorrectly applied his own mathematical formula for determining plaintiff's future wages as consultant. He multiplied the current annual income as a consultant by Saleeby's work expectancy; then divided that sum by 2 to account for plaintiff's six (6) month per year period of employment. His two step calculation was: (1) $51,334.67 × 12.6 (years) = $646,816.84; (2) $646,816.84 ÷ 2 = $371,922. Step (2) is wrong, for the result would be $323,408.42, a difference of $48,513.58. Here again this substantial error may well have entered into the jury's calculation and accounts for the enormity of the verdict rendered: almost $1.8 million before reduction of 15% for contributory negligence.

The only testimony on the availability of work for plaintiff as a consultant came from the plaintiff's economist Dr. Berenson on cross-examination.[29] He testified that he had assumed in his analysis that consulting work was readily available for Saleeby's entire work expectancy (past as well as future); that the basis for his assumption came solely from plaintiff's attorney who

27. T.T. 638–41; 644–51.

28. *Id.*

29. On cross examination:
Q. In other words, you were told that he had received a consulting fee for a period of years and you assumed that he would then be earning a consultant fee for his work expectancy, right? ...
Q. You assumed something, didn't you, Doctor—
A. Yes.
Q. That the work as a consultant would be available during that period of time, right?
A. I had been informed that it was readily available to him.
Q. Who informed you of that?
A. His attorney.
Q. Was this based on any written document or was it just what the attorney told you?
A. Just my recollection is that it was just what he told me....

Q. If you were told that was consulting work in a ship would you assume that that would be available for the rest of his work expectancy?
A. That was my assumption.
Q. Based upon what the attorney told you?
A. That's correct....
Q. So that your projection as to the loss of earnings as a consultant is predicated on the assumption that this type of work would be available to Mr. Saleeby during his work expectancy, right?
A. Yes.
Q. The assumption is predicated on what Mr. Saleeby's attorney told you?
A. Yes.
Q. He did not tell you that the shipyard had closed down about two years ago, did he?
A. No.
(T.T. 644–49)

had so advised him orally. Dr. Berenson admitted that if there was no consulting work available his projection "... might be different [depending] upon whether or not there were other ship yards which wanted to utilize his services..."; that he was unaware that Seatrain Shipbuilding Corporation, the only place Saleeby had done consulting work, had terminated its full time operations two years ago.[30]

We are compelled to state that Saleeby offered no proof whatever that consulting work was available since the date of his accident. This is especially significant here, for the defendant never employed Saleeby as a consultant. Consultant work, as already stated, was a secondary job for plaintiff, undertaken by him during his vacation time. Knowledge as to the availability of consultation work fell within plaintiff's experience. Yet he came forward with nothing on that score.

The testimony regarding the effect of Saleeby's overall medical condition on his ability to do any kind of work in the future was at best conflicting. As to this issue, Dr. Erwin's (called by plaintiff) testimony was limited to the comment he had no opinion since he had not seen Saleeby since October, 1977.[31] Dr. Piggott (plaintiff's witness) stated "... I do not think he will get back to work activity in any of his former jobs for the shipping lines and what not ... and I don't think he is employable now or in the forseeable future...."[32] However, on cross-examination, Dr. Piggott's opinion was that Saleeby could possibly do some type of clerical work.[33]

Dr. Hicks' (plaintiff's internist) testimony also contained uncertainty. On direct examination, he testified that he did not "... think it would be possible for him to do sedentary work requiring sitting; it is tremendously hard on a back of that type. And of course, heavy physical exertion is out of the realm of possibility because of the circulatory and lung problem."[34] On cross-examination, however, he testified that despite the lung condition, Saleeby could perform sedentary work;[35] as to the limitations of his back, Dr. Hicks would have to defer to the knowledge of the doctors at Duke hospital.[36]

According to Dr. Nashold (plaintiff's neurosurgeon) Saleeby's pain and difficulty in movement makes it impossible for him to resume work in the maritime industry or perform even sedentary work.[37] The plaintiff testified that Dr. Nashold advised him to do as much exercise as he could and learn to live with his problems. As a result, Saleeby goes to the Y.M.C.A. between 3 and 5 days each week.[38]

30. Defendant's witness Harland T. Haller, former vice-president of Seatrain, stated that Seatrain had closed down full-time operations two years before this trial commenced; and closed altogether one year before this trial commenced. (T.T. 1125)

31. Dr. Erwin: "Q. Doctor, do you feel that he can do any type of work at this time?
A. No.
Q. No type of work whatsoever? Could he do sedentary work?
A. I haven't seen him or talked to him since October 1977.
Q. So you have no opinion on that, is that right?
A. That's correct." (T.T. 187–88)

32. Plaintiff's Exhibit 47, p. 82.

33. Dr. Piggott testified: "Q. Could he do some type of clerical work, in your mind? Or in your opinion, rather?
A. Yes, sir. Possibly for maybe short periods in a day; maybe a four hour day, or a half a day. Possibly, I don't know. I don't know. (Plaintiff's Exhibit 47, p. 103)

34. Plaintiff's Exhibit 48, p. 36.

35. On cross-examination:
"Q. ... [F]rom your evaluation ... of this man that he is capable of doing some sedentary type of work?
A. From the standpoint of the lungs, he can do sedentary work." (Plaintiff's Exhibit 48, p. 65)

36. Id.

37. T.T. 323–24; 339–40.

38. Plaintiff testified: "I exercise my left leg as much as I can and stay in the steam sauna to try to relax a little bit where I can do this exercise without it hurting too bad to try to get motion and feeling back in this left leg and that's where I stand today, sir...." (T.T. 231–32)

Dr. Balensweig, defendant's doctor, gave it as his opinion that Saleeby could do sedentary work.[39]

Further, in plain view of judge and jury throughout the entire trial lasting two weeks of mostly full trial days, plaintiff's outward appearance, demeanor and physical movements did not reveal the infirmities with which the testimony dealt. He testified extensively; he attended each day's session from start to close. He used his cane for support. His testimony was given in clear, unhesitant, bright tones. While testifying he rose from the witness chair a few times and while a spectator he did likewise. There was no outward evidence of tiredness, absolutely none of exhaustion. No comment whatever thereon was made by counsel in the case.

As we see it from the total trial record, Saleeby—intelligent, industrious and capable—is not so physically limited as to be incapable of mitigating damages by participating in financially rewarding employment.

What we have recited on the issue of damages relating to plaintiff's loss of estimated income constitutes the highlights of the proof most favorable to him throughout the total trial record.

\* \* \*

■ Once liability is established in a case involving an unseaworthiness or a Jones Act claim the shipowner is liable to an injured seaman for any lost wages past, present and future. *Calcagni v. Hudson Waterways*, 603 F.2d 1049 (2d Cir. 1979). Future wages are never certain to occur and are therefore speculative in nature. When future wages are so speculative as to be unsupported by the testimony at trial, the award should be reduced or stricken. *Alexander v. Nash-Kelvinator Corp.*, 271 F.2d 524 (2d Cir. 1959). *See also Lennon v. United States*, 579 F.2d 12 (2d Cir. 1978) (Lumbard, J., dissenting); *DeMauro v. Central Gulf S.S. Corp.*, 514 F.2d 403, 405 (2d Cir. 1975); *Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 443 F.2d

76 (2d Cir. 1971). Moreover, verdicts have been reduced on a motion for a new trial even if there is substantial evidence to support it. *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978) ("... The trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner...."); C. Wright & A. Miller, *Federal Practice and Procedure* § 2806 at 43. *See also Conte v. Flota Mercante*, 277 F.2d 664 (2d Cir. 1960); *Munson v. Long Island R.R.*, 191 F.Supp. 748, 750 (E.D.N.Y.1961). Provided that, in determining whether an award is excessive, the trial judge makes a detailed appraisal of the evidence bearing on damages. *Grunenthal v. Long Island R.R.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968).

■ There are certain variables to be considered by the jury in determining lost wages, some of which we shall mention here: normal earning power, the aggregate of wages, guaranteed overtime and guaranteed vacation pay; work life expectancy; a discount factor; and post accident earning power. *McWeeney v. New York, N. H. & H. R.R.*, 282 F.2d 34 (2d Cir.) (en banc), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); *Calcagni, supra; Yodice, supra*, 443 F.2d at 77; *West v. Jutras*, 456 F.2d 1222, 1227 (2d Cir. 1972); *Milos v. Sea-land Services, Inc.*, 478 F.Supp. 1019 (S.D.N.Y. 1979). *See also Conte, supra*, 277 F.2d at 670; *Canizzo v. Farrell Lines*, 579 F.2d 682 (2d Cir. 1978); *Ferrari v. Moore-McCormack Lines, Inc.*, 294 F.Supp. 1366, 1367 (S.D.N.Y. 1969); *Juan v. Grace Lines*, 299 F.Supp. 1259, 1264 (S.D.N.Y.1969); *Oddenes v. Universe Tankships, Inc.*, 188 F.Supp. 117 (S.D.N.Y.1960). *See generally Modave v. L. I. Jewish Medical Center*, 501 F.2d 1065, 1080 (2d Cir. 1974) (medical malpractice context).

Among other defects which we now undertake to mention is this jury's erroneous and unfounded application of these variables to the credible proof adduced on wages as a chief engineer as well as a consultant.

**39.** T.T. 779.

We are well aware of the prohibitions against upsetting a jury's verdict in a personal injury case. *Cf. Grunenthal, supra*, 292 F.Supp. at 815–16. However where as here, when the proof adduced is compared to the verdict rendered and unequivocally shows that gross and prejudicial error has been committed by the jury so as to render its verdict excessive in the extreme, our judicial conscience mandates that we intrude.

As already stated, lost future wages are speculative in nature and there are certain non-mathematical variables which must be considered:

> The vicissitudes of fortune, the buffetings of fate, and the uncertainties of life and health, must invariably be considered. Fairness and justice require that the amount reached on an actuarial basis be reasonably reduced in the light of these additional factors. Otherwise, damages would be awarded on the basis of an assumed success in one's occupation and a guaranteed income....
>
> *Thomas v. Potomac Electric*, 266 F.Supp. 687, 696 (D.C.D.C.1967).

█ To do so otherwise simply ignores reality as well as creates an unreasonable windfall for the plaintiff. *See generally Puggioni v. Luckenback*, 286 F.2d 340, 344 (2d Cir. 1961); *O'Connor v. United States*, 269 F.2d 578, 582 (2d Cir. 1959); *Civil v. Waterman Steamship*, 217 F.2d 94, 99 (2d Cir. 1954); *Renaldi v. N. Y., New Haven and Hartford Railroad*, 230 F.2d 841, 845 (2d Cir. 1956); *Nye v. A/S D/S Svendborg*, 358 F.Supp. 145, 153 (S.D.N.Y.1973); *In Re Petroleum Tankers*, 204 F.Supp. 727, 731 (S.D.N.Y.1960). Any mathematical certainty then associated with wages must succumb to more realistic evaluation. For instance,"[m]ortality tables are not inflexible rules which the jury must follow, but are guides to assist them in awarding realistic and reasonable damages." *Renaldi, supra*, 230 F.2d at 845.

We express no hesitancy in stating that the jury evidently passed over this vital reality, even though we carefully instructed them to make their own determination, based on common sense, as to each component of the wages assessed. For example: [40]

> ... [T]he fact that the books or tables show that he has a life expectancy of twenty-two years and a work expectancy of 12.6 does not mean that that is from the Bible. You deal with it as you think life dictates. You may not agree with those figures. If so, you have a perfect right to discount them. That is the enormous power of the jury.
>
> What do you think is the work expectancy of this plaintiff based on what you saw and beheld? What do you think is the extent of his remaining period on earth? ...
>
> The work period, the work expectancy of this plaintiff, it has been suggested, is in the neighborhood of 12.6 years from now. You take that into consideration if that figure appeals to you. Otherwise, you use your own measure, based on the all-important ingredient that you bring to your mission here, and that is your experience in life.
>
> Coming back to the issue of permanent injuries, if you should so find in considering life expectancy, you may consider your own experience and the evidence you heard concerning the condition of the plaintiff's health, habits, activities in determining what the plaintiff's life expectancy is as well as his work expectancy.

Further, we are convinced that the erroneous evaluation which produced a $263,000 verdict for medical expenses ($309,411 before reduction for contributory negligence) predicated on proof totaling $48,000, demonstrates an unjustified and misdirected assessment which saturates and typifies the total verdict.

The credible testimony on Saleeby's potential for work as a consultant is fatally defective. There is no indication that any type of work was available since the date of injury. In fact the testimony on this score compels quite the opposite conclusion.

**40.** T.T. 1272–73.

In a case of striking similarity to the case at bar, *Fleming v. American Export*, 318 F.Supp. 194 (S.D.N.Y.1970), aff'd in part and rev'd in part, 451 F.2d 1329 (2d Cir. 1971), the district court was confronted with a seaman-carpenter who had injured his left hand on a circular saw which had no protective guard. The only evidence on the wage issue was: Before plaintiff's injury he had been making $10,000 as a ship's carpenter; after his injury, plaintiff had "put his card" in at the union halls as a ship's carpenter but did not otherwise obtain a ship's carpenter position; after his injury plaintiff only worked as a security guard earning $7,800; and concededly the job market for carpenters had declined. Plaintiff's claim then was for the $2,200 per year impairment of future earning capacity as he could not perform the work required of a carpenter. Judge Levet stated:

> ... The position taken by plaintiff's counsel amounts to a contention that there was a burden on defendant to submit testimony with respect to unavailability of carpentry jobs. This disregards the fundamental principle that the burden of proof is upon plaintiff to prove his damages. 'The law is well settled that the burden of proof is upon the party claiming the damage to prove that he has suffered damage and to prove the elements thereof with reasonable certainty.' *Peters v. Lines*, 275 F.2d 919, 930 (9th Cir. 1960); *Dixon v. Pennsylvania Railroad Company*, 378 F.2d 392, 394 (3rd Cir. 1967). There is no reason to hold that this principle is inapplicable to this element of proof. It is elementary that no verdict may be based upon conjecture.... Apparently, plaintiff's counsel was satisfied with the contention that 'the man says he can't work' and that diminution of earnings can be shown 'by what he earns now and what he earned before and he says he can't do any work but what he is doing....'

*Fleming, supra,* 318 F.Supp. at 201–02. In response to this specific point on appeal the majority disagreed with the district court: "... The defendants evidence did not establish that there were no ship's car-

penters positions available, but only that there were none available on defendant's ships. There was testimony that there were ... at least two United States passenger ships sailing out of east coast ports. Even assuming that no carpenter jobs were available, in awarding damages for loss of future earning capacity the jury could properly have considered whether plaintiff might have been able to get a job in a different line of work but for the injury [citations omitted]." *Fleming, supra,* 451 F.2d at 1332–33.

Judge Moore dissented and argued that the majority implies: (1) "... that the impairment of one's ability to perform his vocation is a ... sufficient showing to support a future damage award.... But clearly an injured plaintiff must show not only that his injury impaired his ability to perform as he formerly did, but also that but for his injury he would be earning his former (or some higher) salary;" and (2) "... that the burden of proving damages is ... on ... defendant [to prove] the non-existence of damages...." *Id.* [Footnotes omitted]

When applied to the instant case, we are certain Saleeby has failed to sustain his burden. The evidence shows that during his decades of seaman's service he did consulting work for Seatrain during 1973 for two and one half months, 1974 for three and one half months, and 1975 for three and one half months. The job was secondary to that of chief engineer and only supplemented his annual income. Saleeby never worked for this defendant as a consultant.

The record is devoid of any factual support on the availability of consultant work. Defendant's witness Mr. Haller testified that Seatrain Shipbuilding Corp. (the only place Saleeby had been a consultant) closed full-time operations at least two years before this trial commenced. Plaintiff has failed to sustain his burden on this score; and defendant has clearly shown that work was not available as a consultant. We believe that plaintiff erred by assuming that the only proof required on this score was plaintiff's statement that he cannot do (nor

has done) work of any kind since the date of his injury and plaintiff's brief prior history of consulting work. Defendant did not provide this type of work for Saleeby in the past and therefore any affirmative proof about it, as heretofore stated, had to come from the plaintiff.

Additionally, the testimony of Dr. Berenson was fraught with misleading errors: The projection into the future (as well as the determination of past consulting wages) was based on Saleeby's working as a consultant for six (6) months a year—a fact never proven; the mathematical computation made by Berenson was overstated by $48,513.58; and the reality of the situation here is that Saleeby earned on average for three years only $9,500 per year as a consultant.

■ We are certain that because of the lack of proof on the availability issue, the brevity with which this job was held by Saleeby in the past, the clear errors in the testimony of Berenson, and the secondary nature of the job, the jury's award (to the extent it so found) was clearly excessive.[41]

It is clear that all the doctors agreed that Saleeby could not engage in his former profession in the maritime industry. We agree. Yet, we also recognize as heretofore stated and so charged the jury that Saleeby has a duty to mitigate his claim for loss of earnings. *Rapisardi v. United Fruit*, 441 F.2d 1308, 1312 (2d Cir. 1971); *Young v. American Export*, 291 F.Supp. 447, 450 (S.D.N.Y.1968); *Campbell v. Tidewater*, 141 F.Supp. 431, 435 (S.D.N.Y.1956). *See also Baker v. Baltimore & Ohio Railroad*, 502 F.2d 638, 644 (6th Cir. 1974); *Alexander v. Meiji*, 195 F.Supp. 831, 834 (E.D.La.1961). We said:[42]

> The plaintiff has a duty to mitigate by returning to work or by obtaining new work in other fields which are compatible

with his ability, aptitude and general health. The plaintiff's recovery, if any, for a loss of past or future earnings must be reduced by the amount, if any, which you, the jury, find that the plaintiff can or could have made had the plaintiff made a reasonable and good faith effort to mitigate his damages.

Saleeby has not worked a day since his injury. In support of his position that he can do no work of any kind, testimony was elicited from all of the doctors who examined Saleeby. That testimony was at best conflicting. But any conflict as heretofore stated must be resolved in favor of the proposition that Saleeby can do some form of sedentary work.

This we believe the jury did not consider or they would not have arrived at the grossly excessive verdict of $1,777,300 before reduction for contributory negligence. The jury's unwarranted award for medical expenses solidifies our conviction that the jury went well beyond the scope of the evidence adduced so as to render its verdict on wages grossly and illegally excessive.

### Pain and Suffering

As to plaintiff's pain and suffering after the accident, the testimony is clear. Dr. Erwin (plaintiff's psychiatrist) stated that when he saw Saleeby in 1977, plaintiff stated he was experiencing pain on movement, sneezing, straining, coughing, driving a car; sleeping only 2 or 3 hours a night. Further, that the chronic pain as well as Saleeby's uncertain occupational future caused depression. Additionally, Saleeby was experiencing lower back pain.[43] Dr. Nashold, plaintiff's neurosurgeon, emphasized that Saleeby is presently experiencing significant pain. He bases this on the tenderness of Saleeby's nerves, the lack of normal feeling, the pain experienced during the clinical

**41.** *See, e.g., Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682, 687 (2d Cir. 1978); *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 591 (2d Cir. 1961); *Wiseman v. Sinclair Refining,* 290 F.2d 818, 820 (2d Cir. 1961); *Conte v. Flota Mercante,* 277 F.2d 664, 669 (2d Cir. 1960). *See also Scheel v. Conboy,* 551 F.2d 41, 43 (4th Cir. 1977); *Werthan Bag Corp. v. Ag-*

*new,* 202 F.2d 119, 121–03 (6th Cir. 1953); *Hoffman v. Sterling Drug,* 374 F.Supp. 850, 860 (D.C.Pa.1974); *Hanson v. Reiss Steamship,* 184 F.Supp. 545, 551 (D.C.Del.1960).

**42.** T.T. 1267.

**43.** T.T. 151, 155, 157.

tests which stretched the nerves, and Saleeby's own statements of pain.[44]

Dr. Piggott and Dr. Hicks (plaintiff's orthopedist and internist) also repeatedly noted the pain Saleeby had experienced throughout his plight.[45]

Dr. Balensweig, defendant's doctor, stated that "... [t]he pain comes from his back. It comes from an abnormal back. He had an abnormal back before the accident.... In my judgment there was some pain at times.... [Today, Saleeby] is getting treatment to alleviate the pain on the basis that there is no operative or treatment available that would work.... He has reached maximum of active medical care...."[46]

It is evident from the proof adduced that during the period from injury to trial, Saleeby's pain and suffering was more severe than it is currently. He had operations, the chief purpose of which was to drastically reduce his pain. During that time, the normal life functions of sleeping, breathing etc., were severely impaired. We are aware that physical pain often produces mental anguish and depression, all of which "enlarges" upon the suffering.

Further, we emphasize that we have no doubt that Saleeby will continue to suffer pain to an appreciable extent in the future. He has permanent scarring in his lung; his left thigh is atrophied, while the numbness in the left leg increases. He must walk with a cane. He cannot sit for any extended period of time; he must rise for a few minutes before resuming a sitting position.

The only statement which made any attempt whatsoever to quantify the pain came from plaintiff's attorney during his summation to the jury: That he felt the jury should consider pain and suffering at $50,000 per year for the last four years.[47]

What we have recited on the issue of damages relating to pain and suffering constitutes the highlights of proof most favorable to him throughout the total trial record.

\* \* \* \*

We note that "... the award for pain and suffering will be reduced by whatever [amount] ... reflects compensation for plaintiff's psychological trauma or his feelings of inadequacy resulting from his mistaken belief that he is unemployable." *Rapisardi v. United Fruit*, 441 F.2d 1308, 1313 (2d Cir. 1971). This has a significant impact here as Saleeby was a hard working and industrious individual before his injury. Dr. Erwin, plaintiff's psychiatrist, clearly testified that certain of Saleeby's depression related in part to Saleeby's "uncertain future" and "loss of his life long occupation."[48]

"Concededly, there is ... no way by which [pain and/or] suffering can either be measured or compensated for in money. But courts are nonetheless required to do precisely that, and they have attempted to resolve this insoluable problem in scores of cases [citations omitted]. As the awards in each case turn on so many varied facts, no purpose would be served in citing precedents." *Moore-McCormack Lines supra. See also Batchkowsky v. Penn. Cent. Co.*, 525 F.2d 1121, 1125 (2d Cir. 1975).

"The many varied facts" (*Moore-McCormack Lines v. Richardson, supra*) present here did not warrant the evident finding by the jury that plaintiff's physical and mental condition was considerably worse than disclosed by the total trial record. We are convinced that the jury's estimate of pain and suffering was groundless and thereby unduly excessive.

### Conclusion

It goes without saying that courts must be most reluctant to interfere with a jury

44. T.T. 317–18.

45. Plaintiff's Exhibit 47, pp. 25; 42; 47; 53–54; 63; 66–67; 78; 84; Plaintiff's Exhibit 48, pp. 14; 34–35; 52.

46. T.T. 756; 758; 829.

47. T.T. 1204.

48. T.T. 151, 155, 157.

determination of damages except where, after the exercise of extreme caution, special circumstances warrant or justify such action. During the last two decades, we do not recall a single personal injury case (out of a very large number) in which we interfered with the jury's verdict on the amount of total damages. Cognizant of the heavy responsibility which devolves upon a trial judge who interferes with a jury's verdict on such damages, we felt duty bound in this opinion to expand in considerable detail—even factual matter of tertiary value.

As Judge Weinfeld observed: "Courts will not interfere merely because the amount of the verdict is large or because they take a different view of the case or would have awarded less. Where there is any margin for a reasonable difference of opinion in the matter, the view of the court should yield to the verdict of the jury, rather than to the contrary." *Fornwalt v. Reading Co.,* 79 F.Supp. 921, 923–24. (citations omitted). To that end, a plaintiff is entitled to the benefit of the most favorable inferences to be drawn from the evidence.

A practical approach to this phase of litigation overwhelmingly establishes that no two cases are alike especially in the nature and extent of the injuries received and suffering experienced.

Except for the jury's declaration as to the extent of medical expenses incurred here and the percentage of plaintiff's contributory negligence, we cannot know on what factors they predicated the balance of the huge verdict they rendered. Yet "[t]he matter of excessive damages is primarily within the discretion of the trial judge . . . though we may review his decision for abuse of discretion." *Comiskey v. Penn. R.R. Co.,* 228 F.2d 687, 688 (2d Cir. 1956) (citations omitted).

Certainly we bear in mind that our jury in this case was carefully and firmly selected. Throughout the trial lasting ten (10) days, the jury paid strict attention, listened carefully to the proof adduced and deliberated approximately seven (7) hours. This is not to say that this jury was incapable of committing error. Long and serious reflection convinces the Court that the jury committed error most grievous, for the verdict fails drastically to "bear some reasonable proportion to the injury sustained and the loss suffered by the plaintiff. . . . Where . . . there is no fixed measure of mathematical certainty, no precise rule or yardstick for translating injury into money, . . . the damages must depend very much upon the good sense and sound, deliberate judgment of the jury upon all the facts and circumstances of the particular case. The discretion of the jury as to the amount of damages to be awarded, while very wide, is not an arbitrary or unlimited discretion, but . . . must be exercised reasonably, intelligently, and in harmony with the testimony before it. . . ." *Fornwalt, supra,* 79 F.Supp. at 923–24.

Chancellor Kent in *Coleman v. Southwick,* 9 Johns 45, 52 (N.Y.1812) had occasion to insist that: "The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous. . . . and extravagant." For us, not only "at first blush" but after prolonged and serious reflection, we completely fail to reconcile the jury's verdict with the law's formula—not the jury's prescription—as to each element of damages. Accordingly, we are duty bound and compelled to pronounce the verdict excessive in the extreme, a "shock to the judicial conscience."

We have no alternative: We are constrained to, and do, grant the motion for a new trial on the issue of damages only.

SO ORDERED.