**Roy L. FRAYSIER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 80–643–CIV–EPS.**

United States District Court, S.D. Florida, Miami Division.

June 10, 1983.

Norman S. Klein, Miami, Fla., for plaintiff.

Lloyd G. Bates, Asst. U.S. Atty., Miami, Fla., Mary McElroy Leach, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND FINAL JUDGMENT AND ORDER DENYING MOTION TO REDUCE AD DAMNUM

SPELLMAN, District Judge.

### I. INTRODUCTION

This is an action brought under the National Swine Flu Immunization Program of 1976, Public Law 94–380, codified at 42 U.S.C. § 247b (the "Swine Flu Act"), and the Federal Tort Claims Act, 28 U.S.C. § 1346(b) & 2671 *et seq.* This action, along with various other actions filed under the Swine Flu Act, was transferred by the Judicial Panel on Multidistrict Litigation to the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Thereafter it was remanded to this court for further proceedings.

Plaintiff, Roy L. Fraysier, age sixty-four, claims that he incurred the neurological disorder known as Guillain-Barre Syndrome (GBS) as a result of a swine flu immunization administered to him in Miami, Florida, on November 15, 1976. The Final Pretrial Order entered by the United States District Court for the District of Columbia (transferee court) provides that if plaintiff proves he contracted GBS following the swine flu vaccination, plaintiff need not prove a theory of liability against the United States. Paragraph IX, Final Pretrial Order, In Re Swine Flu Products Liability Litigation, MDL docket no. 330, Misc. No. 78–0040, November 15, 1979, at p. 10.

■ The plaintiff has the burden of showing to the court that: (1) the condition suffered from is GBS, and that (2) the GBS was caused by the swine flu inoculation and not a superceding, intervening event. The plaintiff's medical history prior to his swine flu inoculation is therefore relevant to determining whether the condition suffered from is GBS.

### II. FINDINGS OF FACT

#### A. Medical History

Plaintiff was disabled from full-time occupation prior to the swine flu inoculation due to a work-related back injury. He incurred the back injury in 1958 in a bus accident that the plaintiff was involved in as a bus driver. In December of 1959, Plaintiff, then 41 years old, underwent a laminectomy operation in order to relieve weakness and ataxia in his lower extremities; and pains in the lower abdomen and thighs. Plaintiff later, in 1960, underwent spinal cord surgery relating to a post-operative infection. The discharge summary of plaintiff's hospitalization from December 21, 1959, until February 1, 1960, includes the results of a neurological examination. The following findings were reported: (1) spastic weakness of both lower extremities,

(2) slightly ataxic and shuffling gait, (3) decreased pin-prick sensation, and (4) absent vibratory sense.

From 1960 to November of 1976, plaintiff at various times complained of weakness in his legs and lower back pain. It is not disputed that from the time of the plaintiff's bus accident to the time of the swine flu inoculation on November 15, 1976, the plaintiff suffered from a disabling injury to his lower extremities. The plaintiff was not, however, totally disabled.

Testimony at trial showed that since the accident in 1958 and surgery of 1959 the plaintiff functioned as a homemaker, taking care of the couple's five children, while his wife worked full-time. Although plaintiff never went back to his job as a bus driver, due to lack of return of the type of coordination needed to operate a bus as a common carrier, over the two years following surgery, gradual improvement gave way to an almost total recovery. Plaintiff walked without a cane, golfed, fished, and hunted. With the help of other family members, plaintiff cleared land and built a frame house in Marion County, Florida.

At the time of trial, the plaintiff described his physical activities since the swine flu inoculation. He is now walking with a shuffling gait and uses a cane. He cannot get into his boat without help. He can no longer mow his lawn, and is not able to function either as a helpmate or sexual partner for his wife. The disabilities he suffers from today have attacked his personality, leaving him disabled both from a physical standpoint and from a mental standpoint, i.e. he is no longer able to function within his family unit as a contributing member.

Plaintiff's life expectancy is 16.37 years. The critical periods of time regarding plaintiff's condition appear from the evidence to cover (1) November 22, 1976, to March 10, 1977; (2) March 10, 1977, to March 10, 1978; and (3) March 10, 1978, to entry of this final judgment, and thereafter in accordance with plaintiff's life expectancy.

### B. Guillain-Barre Syndrome

The testimony of the experts taken at trial established that the cause of GBS is unknown and that the diagnosis cannot be made on the basis of a single laboratory or electrodiagnostic test. Rather, the diagnosis of GBS must be made primarily on the basis of clinical findings; however, laboratory or electrodiagnostic testing may be supportive of the diagnosis. The primary clinical features of GBS are progressive motor weakness of more than one limb and loss of reflexes. Motor impairment may range from mild loss of coordination to total paralysis. In most cases, the syndrome progresses to its zenith within four weeks of its onset, and recovery is seen thereafter in a vast majority of patients. The tempo of progression of the illness is characteristic of the disorder. Medical science has not been able to determine the exact cause of GBS. The most common causes are viral infections and swine flu vaccinations. The authors of an epidemiological study of the incidence of GBS following the swine flu vaccination program concluded that the causal relationship between the swine flu vaccine and GBS extended for ten weeks.

### C. Clinical Findings

The plaintiff was inoculated for swine flu on November 15, 1976. Within approximately two weeks the plaintiff experienced pain and weakness in his lower extremities. On December 7, within three weeks of the inoculation, the plaintiff visited Dr. Reinmuth, the doctor who had performed his back surgery in 1959. The doctor was packing up his office for a relocation out of state. During this abbreviated visit, the doctor prescribed muscle relaxants for the pain, cramping, and spasms in plaintiff's legs.

Over the remainder of December and January the weakness increased, until the plaintiff entered a veteran's hospital on January 24, 1977. While at the VA hospital the plaintiff was treated for septicemia and was told that he had swine flu complications.

Because the diagnosis of GBS is primarily a clinical determination to be made by a knowledgeable physician, the court has placed great weight on the expert testimony given in open court and by deposition.

The defense focuses on the testimony of Dr. Reinmuth and Dr. Avin. Dr. Reinmuth, a neurologist, did not treat the patient for sixteen years; and during the hurried visit on December 7, 1976, he ran no neurological tests. In his testimony, Dr. Reinmuth stated that the cause of plaintiff's spasticity and weakness could have been triggered or exacerbated by many factors. Dr. Reinmuth, at the December 1976 examination of plaintiff, was not familiar with the recovery made by the plaintiff over the preceding sixteen years and was not aware that the plaintiff had had a flu inoculation.

GBS is usually made as a historical diagnosis, i.e. after the syndrome has run its course. Dr. Avin, the VA neurologist, did not diagnose GBS in the plaintiff. The plaintiff was seriously ill with septicemia (a system-wide infection) when he was admitted to the VA hospital in January of 1977. Once the infection was controlled, Dr. Avin found that the plaintiff returned to his "normal" neurological signs, which for plaintiff was a state of hyperactivity. Dr. Avin did not make a historical diagnosis.

The court finds that the defense experts did not take the plaintiff's previous condition into account in their diagnosis of GBS, in effect, treating the plaintiff as if he were a normal patient. The court finds that the plaintiff's previous condition cannot be ignored. It is because of the plaintiff's previous condition that the standardized GBS criteria list cannot be used in a rigid fashion. The defendant's own experts recognize this. In the video-taped depositions submitted to the court, the doctors responsible for the standardized criteria which were promulgated following the swine flu inoculation program and GBS outbreak state that error should be made on the side of the patients and not the government when symptoms appear between the third day and sixth week after inoculation. The plaintiff reported symptoms to Dr. Reinmuth less than three weeks after inoculation. The video-tape depositions also stressed the following: (1) that the distal muscles, i.e. the lower limbs were affected the most; (2) that there was no single diagnostic test for GBS, that one must take into account in formulating a diagnosis any underlying or collateral diseases that might cause or skew the symptoms; (3) that electrodiagnostic techniques never mandate the diagnosis, which is based upon medical judgment; and (4) that the statistics which were used to develop the GBS symptom criteria were weak because of the methodology used. Specifically the weakness was attributable to the fact that no records were kept on the non-immunized persons, records were kept only on those who were immunized and reported GBS. There were no records on those who had GBS and were not reported; and the attack rate for GBS was approximately half of the "Kennedy" study attack rate—a hospital study based upon soft data, i.e. one with only forty subjects in the group.

Based upon the foregoing and emphasizing that the diagnosis of GBS is a clinical one made by a knowledgeable physician, the court has placed a greater weight upon the opinions of the two neurologists who have made a historical diagnosis, Dr. Sheinblum and Dr. Sheramotta.

Dr. Sheinblum is a board certified neurologist and a fellow of the Academy of Neurologists. He first saw the plaintiff on June 15, 1981. After examination and review of (1) the plaintiff's previous medical records, including Dr. Reinmuth's notes following the December 7, 1976 visit; and (2) the VA hospital records, Dr. Sheinblum stated that it was his opinion, based upon reasonable medical certainty, that Mr. Fraysier had developed GBS as a result of the swine flu inoculation of November 15, 1976. Dr. Sheinblum's opinion was based upon the following facts: (1) the plaintiff had the inoculation two weeks before the advent of the weakness in his lower extremities; (2) while the plaintiff had mild residuals from the surgery in 1960, he was functional in his extremities; (3) there was

a history of progressive weakness leading up to the 1976 hospitalization. (4) the hospitalization was complicated by the septicemia, which aggravated the existing condition; (5) the nadir of the illness was reached prior to hospitalization; (6) the plaintiff's protein levels rose gradually to the nadir levels and then subsided gradually along with clinical improvement (this progression is consistent with GBS criteria); (7) the progression of weakness in the lower extremities, paralysis, and recovery found in the plaintiff are consistent with GBS criteria; and (8) the polyneuropathy indications of diminished deep tendon reflexes and loss of ankle jerks are consistent with GBS criteria.

Commenting on the GBS criteria of total loss of reflexes relative to the plaintiff, the expert focused on the plaintiff's "baseline" reflexes as hyperactive, and found therefore, that the diminished reflex paralleled the criteria for a patient with a normal baseline reflex who develops total loss of reflexes.

The defense argued that the absence of this criteria ruled out a diagnosis of GBS in the plaintiff. The court disagrees.

The defense expert, Dr. Reinmuth's, opinion of no GBS in the plaintiff was supported by a laboratory test which showed a particular type of cells in the spinal tap during the 1976 hospitalization. The GBS criteria require the absence of these cells. Dr. Sheinblum pointed out that the hospital charts show that the spinal tap was "traumatic," i.e. that some of the plaintiff's blood leaked into the spinal fluid causing the poly cell reading. A second tap revealed no poly cells, which is consistent with the GBS criteria for diagnosis.

The defense argues that the plaintiff complained of pains in his leg to his regular physician, Dr. Mayer, on September 14, 1975, a full two months before the swine flu inoculation. The court notes that there was no complaint of weakness, a key GBS criteria. The combination of pain and weakness occurs after the inoculation, its onset within the GBS criteria.

Dr. Sheramotta, plaintiff's expert witness, whose specialty is neuro-immunology, a subspecialty of immunology. He has published extensively in his area, which includes the study of GBS. Reviewing the plaintiff's symptoms, Dr. Sheramotta found them consistent with GBS criteria, concluding that the plaintiff had developed GBS following, and resulting from the swine flu vaccination. The court agrees with Dr. Sheramotta's assessment.

The court finds that the plaintiff has sustained his burden of proof that he (1) suffered from GBS; and that (2) the GBS was caused by the swine flu inoculation.

Any of the foregoing findings of fact which constitute conclusions of law are hereby adopted as conclusions of law.

## III. CONCLUSIONS OF LAW

### A. Liability

This court's jurisdiction is based on the Federal Tort Claims Act, 28 U.S.C. § 1346(b) & 2671 *et seq.,* and the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b *et seq.* Venue is proper in this district.

The applicable substantive law is that of the state of Florida. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The United States is liable to plaintiff in this action because the injuries of plaintiff were Guillain-Barre Syndrome, were the result of a swine flu vaccination, and were proximately caused by a negligent or wrongful act or omission of the United States, its agencies, employees, or program participants. *Compare, Alvarez v. United States,* 495 F.Supp. 1188 (D.Colo.1980), (Appendix, hereinafter "App.", Tab A); *Anger v. United States,* Civil · No. 80–F–105, D.Colo., August 3, 1981, App. Tab B; *Ary v. United States,* Civil No. 79–243, D.Okla., February 27, 1981, App. Tab C; *Bisi v. United States,* Civil No. H–79–391, D.Conn., August 28, 1981, App. Tab D; *Cox v. United States,* Civil No. 78–359–1, S.D.Iowa, May 22, 1981, App. Tab E; *Daniels v. United States,* Civil No. 78–X–0987–S, N.D.Ala., September 21, 1981, App. Tab F; *Davidson*

**1090**

*v. United States,* File No. G–78–715, W.D. Mich., October 3, 1980, App. Tab G; *Dill v. United States,* Civil No. 78–106–K–O, N.D. Miss., August 17, 1981, App. Tab H; *Fritschen v. United States,* Civil No. 79–1031, D.Kansas, January 15, 1981, App. Tab I; *Horn v. United States,* Civil No. 79–69C(1a) E.D.Missouri, July 24, 1981, App. Tab J; *Lightsey v. United States,* Civil No. 579–13, S.D.Ga., September 9, 1981, App. Tab K; *Lotzer v. United States,* Civil No. A3–79–39, D.N.D., August 3, 1981, App. Tab L; *Peoples v. United States,* Civil No. 79–X–0979–S, N.D.Ala., March 21, 1981, App. Tab M; *Reaves v. United States,* Civil No. 79–0156–CIV–4, E.D.N.C., May 15, 1981, App. Tab N; *Steier v. United States,* Civil No. 78–845–CIV–TK, M.D.Fla., April 16, 1981, Tab O.

■ The plaintiff may recover an amount in excess of that stated in his administrative claim because of newly discovered evidence that could not be reasonably discovered at the time of the filing of the claim. *McDonald v. United States,* 555 F.Supp. 935 (M.D.Pa.1983); *Gallimore v. United States,* 530 F.Supp. 136 (E.D.Pa. 1982).

### B. Damages

Plaintiff seeks at trial an amount in excess of that stated in his administrative claim which was $50,000.00. Pursuant to *McDonald v. United States, supra,* and *Gallimore v. United States, supra,* this court finds that he may lawfully do so. Plaintiff testified at trial that at the time he filed his administrative claim he thought that his condition would improve; and that it has not improved to his expectations. Furthermore, it appears from the record that such a prediction could not have been made with any certainty at that time. The court finds that this constitutes newly discovered evidence not reasonably discoverable at the time of the presentation of the claim to the federal agency. *See McDonald* and *Gallimore, supra.*

■ The elements of damages that may be taken into consideration according to the law of Florida are as follows: (1) bodily injury; (2) pain and suffering; (3) disability; (4) disfigurement; (5) mental anguish; (6) loss of capacity for the enjoyment of life; (7) aggravation of an existing disease or physical defect; (8) loss of earnings and earning capacity; and (9) hospital and medical expenses. Florida Standard Jury Instructions in Civil Cases, Instruction no. 6.2(a), (b), (c), & (d). The plaintiff was not employed or employable at the time of the accident and therefore there can be no loss of earnings or earning capacity. Because he was treated by the VA, there are no medical expenses. Plaintiff's damages are therefore limited to the first seven elements in the above list.

### IV. ADJUDICATION OF LIABILITY AND AWARD OF DAMAGES

Based upon the above and foregoing, liability is hereby found in favor of the plaintiff and against the United States, and damages are awarded in favor of the plaintiff and against the United States as follows: for the period from November 22, 1976, to March 10, 1977—$50,000.00; for the period from March 10, 1977, to March 10, 1978—$25,000.00; for the period from March 10, 1978 to the entry of this final judgment, and thereafter—$200,000.00. This is in a total amount of $275,000.00, for which judgment is hereby entered.