Willie **WILLIAMS**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 86 Civ. 9401 (WCC).

United States District Court,
S.D. New York.

May 26, 1989.

Fields & Rosen, New York City (Lawrence P. Biondi, Stephen H. Fields, of counsel), for plaintiff.

James R. Campbell, Atty., New York City, for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This admiralty action was brought by plaintiff Willie Williams to recover damages for injuries allegedly sustained at sea while employed as chief pumpman on defendant's vessel, the U.S. Sealift Atlantic. The action was tried before the Court without a jury. This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R.Civ.P.

### FACTUAL BACKGROUND

Williams was born on February 5, 1948 in Jacksonville, Florida. He is married, and has one child. In 1967, Williams joined the Navy. After his discharge, he became a merchant seaman, performing duties as a messman. Shortly thereafter he entered a trade school to become a goldsmith. He attended the school for two and a half years, and spent $4,000 for tuition and tools. Although Williams completed this training, he was unable to find a job as a goldsmith, and decided to pursue a career as a seaman.

Williams initially served as a steward. He soon moved, however, to the engine room where he did maintenance and repair work for three years. In 1982, he passed the examinations required to become a pumpman, and began serving in this capaci-

ty on a number of vessels. Williams says he enjoyed his career as a seaman. His long-term goal was to become an engineer.

Plaintiff joined the Sealift Atlantic on February 14, 1986. On April 5, 1986, he was injured while attempting to drain ballast and product in a cargo line, to make the vessel ready for loading in Puerto Rico.

Williams immediately reported his injury to chief mate Paul Fehskens, who sent him to the ship's physician. The medical officer noted that plaintiff's shoulder was swollen, gave him ice to reduce the swelling, and suggested that plaintiff see a doctor. When the vessel arrived in Port Jabo Coa, Puerto Rico, on April 7, 1986, plaintiff was given a master's certificate to go ashore and see Dr. Arturo Machin. Machin's diagnosis was a "contused right elbow with internal tissue bleeding." He concluded that Williams was not fit for sea duty. Plaintiff's Exhibit 4. The ship's medical officer then prepared an accident report. Plaintiff's Exhibit 2. Plaintiff was repatriated home on April 8, 1986.

On April 10, 1986, Williams began treatment with Dr. Michael Fiore. He complained of neck and right upper extremity pain, and right elbow and hand pain with tingling and numbness. The doctor concluded that Williams suffered from an acute traumatic contusion of the right elbow, as well as a cervical strain or sprain with a misalignment of the C5 vertebra, which caused a protrusion of the vertebral disc and produced pressure on the adjacent nerves. Dr. Fiore treated Williams for two months with electrical muscle stimulation and ultrasound. On April 24, 1986, Fiore sent a report concerning plaintiff's condition to Marine Transport Lines, Inc. ("Marine Transport"). Plaintiff's Exhibit 7. Among his findings, he noted "[h]yperflexion malposition of C5 atop C6." He concluded: "Patient will be unable to work for approximately 4 more weeks. Should be able to return to work in late May." *Id.* Fiore saw Williams again on May 31, 1986, and later wrote: "We do anticipate a complete recovery in the near future." *Id.*

Yet Williams' discomfort continued. On June 13, 1986, a physician affiliated with Marine Transport, Dr. Melchor Carbonell, began treating plaintiff as an out-patient at the Methodist Hospital in Jacksonville, Florida (the "Hospital"). On that date, X–Rays were taken on the basis of a diagnosis of "possible contusion, right elbow; possible strain, cervical muscle." Plaintiff's Exhibit 7. The Radiology Report noted "no abnormality" in the cervical spine or right elbow. *Id.* Dr. Carbonell continued to treat plaintiff at the Hospital.

By the middle of July, Carbonell found it advisable to refer plaintiff to Dr. Gaston J. Acosta–Rua, a neurosurgeon. After an initial examination, Acosta–Rua thought it unlikely that Williams was significantly weaker or was suffering from a herniated disc. Plaintiff's Exhibit 7.

On July 16, 1986, Acosta–Rua requested that plaintiff undergo a cervical CAT scan and myelogram. Plaintiff's Exhibit 7. These tests revealed a slightly bulging disc at C5–6 and a defect at C6–7, and Acosta–Rua apparently concluded that surgery was needed. *Id.* About a month later, Acosta–Rua referred Williams to Dr. Jacob Green for a second opinion. Green observed moderate weakness throughout plaintiff's right upper extremity. He suggested that Williams undergo another CAT scan and an EEG prior to surgery. *Id.*

On August 26, 1986, Williams was admitted to the Hospital for surgery. The next day, Acosta–Rua performed cervical laminectomies and foraminotomies at C5–6 and C6–7. The procedures were described in the Operative Report as follows:

> The flap was removed exposing the dura and nerve which upon retraction of the nerve a[n osteophyte] was palpated anteriorly. Good decompression of the nerve was obtained.... Using the same technique, decompression of C6 and C7 nerve was performed with foraminotomy. Here the nerve was very free and I was not able to palpate any osteophyte anteriorly. I made a good search for any free fragment of this but none was found. The disc was firm.

Plaintiff's Exhibit 7.[1] After the operation, fragments of the osteophyte, and perhaps some other bone samples, were sent to the Pathology Department for analysis. The Surgical Pathology Report noted that the pre-operative and post-operative diagnosis was a "herniated cervical disc." *Id.* Plaintiff was discharged in good condition on September 1, 1986. The final diagnosis was cervical spondylosis. *Id.*

On April 21, 1987, Dr. E. Franssen examined Williams on behalf of the National Maritime Union. Plaintiff was found permanently not fit for sea duty. Williams has not worked since the vessel arrived in Puerto Rico on April 7, 1986.

Plaintiff alleges that the Sealift Atlantic was unseaworthy, that the chief mate of the vessel was negligent, and that he was injured as a result of the unsafe condition. He seeks one million dollars in damages.

### LEGAL STANDARDS

The Complaint alleges two cause of action. The first is brought under the Jones Act, 46 U.S.C. § 688; the second is a claim for unseaworthiness grounded in the Court's admiralty jurisdiction, 46 U.S.C. §§ 741 & 781.

■ In order to recover under the Jones Act, Williams must establish, by a preponderance of the evidence, three elements: (1) that at the time of his injury, he was acting in the course of his employment as a member the vessel's crew, *McCall v. Overseas Tankship Corp.*, 222 F.2d 441, 443 (2d Cir. 1955); (2) that defendant was negligent, *Rosenquist v. Isthmian S.S. Co.*, 205 F.2d 486, 488–89 (2d Cir.1953); and (3) that the negligent act caused plaintiff's injury, *Oliveras v. United States Lines, Co.*, 318 F.2d 890, 893 (2d Cir.1963). To prove causation, the plaintiff need only show that the negligence played some part, however small, in bringing about the damage. *Ferguson v. Moore–McCormack Lines, Inc.*, 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957).

■ Williams also claims that the vessel was unseaworthy. Under maritime law, every shipowner or operator owes to every member of the crew employed aboard the vessel the non-delegable duty to keep and maintain the ship, and all decks and passageways, appliances, gear, tools, and equipment of the vessel, in a seaworthy condition at all times. *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 99, 64 S.Ct. 455, 457, 88 L.Ed. 561 (1944); *Beadle v. Spencer*, 298 U.S. 124, 128, 56 S.Ct. 712, 713–14, 80 L.Ed. 1082 (1936). In order to recover on his claim of unseaworthiness, Williams must establish by a preponderance of the evidence that: (1) he was a member of a vessel in navigation at the time he suffered injury; (2) the vessel was unseaworthy, i.e., some part of the vessel was not reasonably fit to be used for the purpose intended, *Mitchell v. Trawler Racer Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); and (3) the unseaworthy condition caused or contributed to the injury and consequent damage sustained by the plaintiff, *Dimas v. Lehigh Valley R. Co.*, 234 F.2d 151, 154 (2d Cir.1956). Liability for an unseaworthy condition does not depend upon negligence. *Mahnich*, 321 U.S. at 100–01, 64 S.Ct. at 458.

■ Under the Jones Act and the general maritime law that governs unseaworthiness claims, the doctrine of comparative negligence applies. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953); *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 429, 59 S.Ct. 262, 265–66, 83 L.Ed. 265 (1939); *Ammar v. American Export Lines, Inc.*, 326 F.2d 955, 959–60 (2d Cir.), *cert. denied*, 379 U.S. 824, 85 S.Ct. 48, 13 L.Ed.2d 34 (1964). Thus, if a seaman's negligence has contributed to the cause of his injury, his recovery should be reduced proportionately. The seaman's negligence does not defeat his right to recover damages unless his negligence is the sole cause of his injury. The burden of showing that the seaman is guilty of contributory negligence is

---

1. There is a blank space in the original that I have filled with the bracketed term "osteophyte." I believe that the term was inadvertently left out by the physician's secretary. Only the word osteophyte makes sense in context.

on the defendant. Assumption of risk is not a defense to such suits. *Socony–Vacuum Oil*, 305 U.S. at 428, 59 S.Ct. at 265.

 In assessing damages, the fact-finder should ascertain the past and future impact of the injury by examining (1) the nature, extent, and duration of the injury; (2) the plaintiff's pain, discomfort, suffering, and anxiety; (3) the reasonable expenses of necessary medical care; and (4) any lost earnings. 2 M. Norris, *The Law of Seamen* § 697 (3d ed.1970) [hereinafter Norris]. In determining future lost earnings in a disability case, the fact-finder should subtract the plaintiff's post-accident earning power from his normal earning power (both figures should be after-tax), and multiply the loss by the plaintiff's life expectancy. The resulting figure should then be discounted to its present value. *Cf. McWeeney v. New York, New Haven & Hartford Railroad Co.*, 282 F.2d 34, 35, n. 3 & 39 (2d Cir.), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). Of course, the plaintiff's post-accident earning power should reflect the plaintiff's duty "to take reasonable steps to effect a cure for his injuries and to mitigate damages." Norris § 697 (Supp.1984).

## DISCUSSION

### I. Liability

At trial, plaintiff testified that, when he joined the Sealift Atlantic, the relief chief mate showed him a fourteen-inch blue bulkhead valve in the lower pump room, and informed him that the wheel that controls that valve is difficult to open. He instructed Williams to open this valve all the way with the wheel wrench, a tool which is ordinarily used only to crack valves open.

Plaintiff testified that on the day of the accident, he cracked the valve, and began turning it with the wheel wrench. When the wheel stuck abruptly, plaintiff lost his balance, and hit his elbow on the "blue drop" (a vertical pipe which happens to be painted red). He maintained that photographs of the area around the wheel corroborated his story. Paint had been chipped off a pipe near the wheel; plaintiff testified the paint was chipped by the wheel wrench. Plaintiff's expert, James C. Plumback, II, agreed that the damage was caused by improper use of the wheel wrench over the years. He explained that the wrench would not reach the pipe when used to crack the valve. It could strike the pipe, however, if used to open the valve all the way.

Defendant contended that William's accident was caused by his own negligence. During cross-examination, Williams admitted that, although the chief pumpman takes orders from the chief mate, maintenance of the pump room is the pumpman's responsibility. Defendant contended that Williams failed properly to care for the valve and wheel. There was testimony that, although plaintiff knew that the wheel did not work properly, he never took the packing or valve apart. But Williams explained that he did not believe the packing was defective; he had inspected it the day after he arrived on board.

Defendant also proffered evidence that plaintiff's story was recently fabricated. Shortly after the accident, Williams described the incident as follows: "I was opening the blue bulk head valve, in the lower pump room, my right hand sliped [sic] and I hit my right elbow on the blue drop." Defendant's Exhibit B; *see also* Plaintiff's Exhibit 2; Deposition of Chief Mate Paul Anton Fehskens at 13 [hereinafter Fehskens Deposition]. At trial, Williams admitted that he never reported the defective condition of the valve to the chief mate or his attending physicians. It appeared, however, that plaintiff saw no need to report the defect to the chief mate, since he was informed of the problem by the relief chief mate when he boarded the vessel. Similarly, Williams did not feel that telling his physicians of the defect would advance his medical treatment.

Defendant also contended that Williams should have used the wheel in the upper pump room to open the valve. It was uncontested that the valve could be opened using either wheel. Turning the upper wheel, which is connected to the lower wheel and valve by sixty or seventy feet of

complex mechanical linkage, would require overcoming the resistance of the linkage, and would also have required the use of a wheel wrench, not merely to crack open the valve, but to complete its opening. Although the upper wheel was more accessible, plaintiff's testimony, that the wheel is only used in "emergencies," was confirmed by plaintiff's expert, Plumback, who testified that the upper wheel would be used only if the lower pump room was flooded. The testimony of Captain DeVillez, defendant's expert, that pumpmen typically use both wheels interchangeably, depending on the pumpman's convenience, is not persuasive in a situation like the present, where the valve is so difficult to open, even without the added resistance of a complex mechanical linkage.

Although plaintiff's expert inspected the vessel on May 19, 1986, defendant's representative refused to permit the expert to open the valve. The expert was apparently told that no wheel wrench was available. While I am amazed at the expert's lack of persistence, defendant's behavior certainly suggests that defendant had something to hide.

Defendant's expert visited the vessel on three occasions in 1988. He testified that during one visit, he used a pipe wrench to crack the valve from the lower wheel and was then able to turn the wheel manually a couple of times. Another time, he observed the chief mate open the valve from the upper wheel. He concluded that, if the valve was not modified between the time of the accident and the time he inspected the vessel, plaintiff's injury was not caused by a defect in the valve.

Plaintiff, however, submitted evidence that the valve might have been repaired in April or May, 1988. Although the experts disagreed over how to interpret the documentary evidence, the vessel's repair invoices contained a reference to "pump room valves." It also contained a cryptic qualifier, "Misc.—if req'd—operational requirement," and quoted a fixed price for such work.[2] Plaintiff's Unmarked Exhibit, Attachment # 3, Item # 333. While the evidence of a subsequent repair is far from conclusive, it is enough, together with the evidence that defendant refused to allow plaintiff's expert to open the valve, to weaken the significance of the testimony of defendant's expert that the valve could be opened manually.[3]

I am persuaded that the valve was hard to open. Even after cracking open the valve, Williams apparently needed to use the wheel wrench to turn the lower wheel, which should not have been necessary. The only evidence to the contrary is the statement by defendant's expert, DeVillez, that in 1988, he personally opened it and, after using a wrench to crack the valve, turned it by hand. However, that was two years after the accident, and DeVillez was unable to express an opinion as to the condition of the valve at the time of the accident. I conclude, therefore, that plaintiff's testimony, that the lower wheel was extremely hard to turn, and that he was told about this condition when his duties were explained to him upon boarding the vessel, is convincing and that it has not been persuasively contradicted.

■ I find that at the time of the accident, Williams was using the wheel wrench to complete opening of the valve, and that at one point his hand slipped, or the wrench slipped, and his elbow struck a vertical line to the right of the lower wheel. Since this vertical line was approximately three feet from the grating on which Williams was standing, it was not where his elbow could ordinarily hit it. I assume, therefore, that when plaintiff's hand slipped off the wheel wrench, or when the wrench slipped off the lower wheel, Williams lost his balance and

---

**2.** Defendant correctly points out that, under Rule 407, Fed.R.Evid., the invoices may not be used to prove liability. They may be used, however, "for another purpose," *id.*, in this case, to undermine the opinion of defendant's expert who may have opened the valve after it was repaired.

**3.** Chief Mate Fehskens testified that, to the best of his knowledge, repairs were not requested for the valve. Fehskens Deposition at 7. Fehskens, however, left the Sealift Atlantic in the middle of 1986. *Id.* at 9. He would therefore not know of repairs made in 1988.

fell, causing his elbow to strike the vertical line.

I am persuaded that there is liability. The need to use a wheel wrench to complete opening of the valve from the lower wheel constituted an unsafe condition that made the vessel unseaworthy. Moreover, the relief chief mate acted negligently when he instructed Williams to use the wheel wrench for a purpose which it should not have been necessary. Furthermore, I am not convinced that, under the circumstances, a reasonable pumpman would have used the upper wheel to open the valve. I find that plaintiff has established defendant's 100% liability by a preponderance of the evidence.

## II. Damages

The opinions of four experts were offered at trial on the issues of disability and causation. Two experts testified on plaintiff's behalf. Defendant offered the testimony of a third expert, and, by stipulation, the report of a fourth. The Court was also given plaintiff's medical file. Plaintiff's Exhibit 7. The medical file is described in the "Background" section of this Opinion.

Dr. Arthur Greenspan, a neurologist and psychologist who testified on plaintiff's behalf, based his opinion on Williams' medical records and his examination of plaintiff on August 25, 1988. Greenspan found that Williams no longer has a herniated disc, but is still experiencing neck pains due to arthritis and osteophytes. He admitted that these conditions were probably present before April 5, 1986, but contended that they were dormant prior to the time of the accident. He concluded the accident was the direct cause of plaintiff's symptoms, and that the surgeon had failed to remove all of the osteophytes. During cross-examination, Greenspan admitted that many of the tests he performed were subjective; the patient could voluntarily affect the results. The doctor also admitted that, although Williams is not fit for sea duty, he is capable of "bench work."

Plaintiff's second expert was Dr. Robert Zaretsky, an orthopedic surgeon who examined Williams on April 21, 1987 and August 24, 1988. Zaretsky found that the accident disrupted the pre-existing osteophytes, and caused them to pinch plaintiff's nerves. The doctor contended that plaintiff's movement is somewhat restricted, and that, as a result, his upper right extremity has atrophied. He also reported that Williams complained of impotence, but, as defendant pointed out on cross-examination, Williams fathered a child after the accident. Zaretsky concluded that Williams should avoid "heavy manual labor."

Defendant called Dr. Vincent Lodico, a traumatic surgeon. Lodico examined Williams on April 22, 1987 and on August 25, 1988. After the first visit, the doctor found that plaintiff was suffering from spondylosis and arthritis which had developed as part of the aging process—not from trauma. He suggested that the patient perform certain exercises for six to eight weeks, and then return to work. After the second examination, Lodico found Williams fit for duty. He remarked that the surgical operation performed in 1986 had been successful. While the accident might have resulted in a mild sprain, Lodico concluded that Williams had fully recovered by the end of June, 1987.

Defendant also offered the report of Dr. Ralph Olson, a neurosurgeon who saw Williams on August 23, 1988. Olson found that Williams is still experiencing some restriction in neck movement, as a result of the 1986 operation. He found no evidence of a herniated disc, and concluded that Williams' recent complaints of back pains are unrelated to the accident.

It is uncontested that when plaintiff's elbow struck the blue drop, his arm became seriously swollen. It is clear that Williams was at least temporarily disabled as the result of this injury.

I must reject, however, plaintiff's claim of permanent total disability. He testified that he wrenched his upper back, and that this caused radiculitis on the right side, shoulder, and arm, making it impossible for him to work. His medical experts testified that, although osteophytes had formed on plaintiff's cervical vertebrae prior to the accident, this condition would not have

caused plaintiff any pain had the osteophytes not been pushed into plaintiff's nerves during the accident. Absent the accident, they said, there would have been no need for the laminectomy and foraminotomy which removed the pressure on plaintiff's nerves. Defendant's experts, on the other hand, found no connection between the accident and Williams' pinched nerve.

I am persuaded that the accident resulted in a neck sprain and a herniated disc. I am not convinced, however, that it exacerbated plaintiff's osteophyte problem. During the 1986 operation, the surgeon failed to discover any free osteophyte fragments. Plaintiff's Exhibit 7. It seems likely that, if the osteophytes were jolted during the accident, fragments would have broken free. I therefore agree with defendant's expert, Lodico, that plaintiff's spondylosis was merely the result of aging.

█ But even assuming that plaintiff's experts are right, and that the accident, and resulting neck injury, caused Williams to become permanently unfit for sea duty, or for any other work involving physical strain, plaintiff is not incapacitated from earning a living doing other things. Even plaintiff's expert admitted that Williams can perform "bench work." Moreover, plaintiff testified on cross-examination that he has not sought any other type of work since April 5, 1986. He is not entitled to recover for the rest of his life what he would have earned at sea; the law requires him to mitigate his damages by finding other employment. *McCrann v. United States Lines, Inc.*, No. 81 Civ. 0486 (MEL), Slip Op. at 8, 1985 WL 2881 (S.D.N.Y. October 2, 1985) (LEXIS, Genfed Library, Dist File), *aff'd*, 803 F.2d 771 (2d Cir.1986).

"The burden of showing that a plaintiff unreasonably failed to minimize damages rests with the wrongdoer." *Federal Insurance Co. v. Sabine Towing & Transportation Co.*, 783 F.2d 347, 350 (2d Cir. 1986). Once the defendant presents such evidence, the fact-finder must determine

what is "reasonable." Ordinarily, it will not be reasonable to expect a manual laborer, who is injured and prevented from returning to his chosen line of work, to enroll in college or pursue a new career path of speculative financial reward. *Cf. Baker v. Baltimore & Ohio Railroad Company*, 502 F.2d 638, 644 (6th Cir.1974) (FELA).[4] Yet a worker who previously engaged in heavy labor may reasonably be expected to earn a living by switching to lighter work. *Cf. Isgett v. Seaboard Coast Line Railroad Company*, 332 F.Supp. 1127, 1143 (D.S.C.1971) (FELA). The standard that governs a plaintiff's earning potential is "whether she can by reasonable diligence find gainful employment, given the physical condition in which the accident left her." *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1197 (7th Cir.1982); *accord Baker*, 502 F.2d at 644; *Burden v. Evansville Materials, Inc.*, 636 F.Supp. 1022, 1037 (W.D.Ky.1986), *aff'd*, 840 F.2d 343 (6th Cir.1988). The fact-finder should thus determine how much the plaintiff is capable of earning, given his physical condition, age, education, employment history, and rehabilitative potential, and discount that figure by the risk that appropriate work will be unavailable. *See O'Shea*, 677 F.2d at 1197.

While there is no specific evidence in the record as to what Williams could earn in some other type of occupation, defendant presented enough evidence at trial to support an inference that plaintiff acted unreasonably. Plaintiff admitted on the stand that he has made no effort to find another job, and his own expert acknowledged that plaintiff is capable of light work. Williams is intelligent and relatively young. He has had specific training in goldsmithing. There are certainly many other jobs that Williams would be able to perform. Indeed, even if plaintiff had not been injured, he would have found it difficult to find employment as a seaman, considering the state of the American shipping industry. I am persuaded that with reasonable dil-

---

4. Since the Jones Act extended to seamen the rights that railroad employees already enjoyed under the Federal Employees' Liability Act, 45 U.S.C. § 51 et seq. ("FELA"), cases decided under FELA are persuasive in Jones Act cases. *See Buzynski v. Luckenbach S.S. Co.*, 277 U.S. 226, 228, 48 S.Ct. 440, 441, 72 L.Ed. 860 (1928).

igence Williams could earn in the future as much, if not more, than he would have earned had the accident not occurred.

The only evidence concerning Williams' prior earning capacity was his testimony, corroborated by income tax returns, concerning his income in 1985. Plaintiff's Exhibits 5 & 6. That year, his after-tax income, not including unemployment compensation, was $17,106.14. *Id.*[5] I assume that Williams could have earned approximately that amount in each subsequent year through 1987. I find that the accident caused Williams to be out of work from April 7, 1986 through June, 1987. After that time, plaintiff was no longer fully disabled. Even if he was unfit for sea duty after that time, he could have mitigated his damages by finding another line of work. Williams is not entitled to recover lost wages after June, 1987. Plaintiff's disability for one year and three months resulted in approximately $22,000 in lost wages. I find that the injury caused Williams significant pain and suffering in the past, but that he will experience only minor pain and suffering in future years. Plaintiff presented no evidence concerning his medical expenses. I therefore find that he should be awarded compensatory damages in the following amounts:

| | |
|---|---|
| Past Pain & Suffering | $15,000 |
| Future Pain & Suffering | 5,000 |
| Past & Future Medical Care | 0 |
| Past Earnings Lost | 22,000 |
| Future Earning Capacity Lost | 0 |
| TOTAL | $42,000 |

### CONCLUSION

For the reasons stated above, plaintiff Willie Williams is entitled to judgment against the United States of America in the amount of $42,000. Settle judgment on two weeks' notice.

SO ORDERED.

---

**5.** To obtain this figure, I subtracted plaintiff's "total tax," $4,378, from his "total wages, salaries, tips, etc," $21,484.14.