James EARL, Plaintiff,

v.

BOUCHARD TRANSPORTATION CO., INC., and Tug Marion C. Bouchard Corp., Defendants.

No. CV–85–4234.

United States District Court, E.D. New York.

April 24, 1990.

Paul C. Matthews, New York City, for plaintiff.

Celestino Tesoriero, Grainger, Tesoriero & Bell, Mark F. Muller, Freehill, Hogan & Mahar, New York City, for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Plaintiff James Earl, a 66 year-old former tugboat deck hand, brings an action against his employer under the Jones Act, 46 U.S.C.App. § 688, and general maritime law for injuries suffered as a result of two separate accidents in 1984. As a consequence of his injuries he claims he was forced to retire on May 16, 1985, approximately a month before turning 62. He claims damages for, *inter alia,* loss of future earnings on the grounds that, absent injury, he would have continued to work at least an additional three years and

five weeks—that is, until his 65th birthday, if not longer.

After a three day trial, the jury found for plaintiff and awarded him a total of $855,000 in damages, of which $425,000 was attributed to lost earnings suffered as a result of the second accident. Defendant moves for a new trial or remittitur.

There exists at least some evidence to support a finding that Earl, absent the accident, would have been able to work past the age of 62 and that he would have done so. Regardless of his pre-accident intentions, it is apparent that plaintiff's earning capacity—or work-capital—was permanently impaired or depleted as a result of his injuries.

Theoretically the human working machine can last (with some decreases in effectiveness through illness and decrepitude)—and thus has economic value—almost to the point of death. As a matter of law, then, an award taking into account any loss of value due to injury or death caused by a tortfeasor, can take into account even this residual and declining loss of value up to the time of predicted death. There is a considerable effort in a shrinking labor market to keep older people employed beyond the usual date of retirement. *See* Lewin, *Too Much Retirement Time? A Move is Afoot to Change It*, N.Y. Times, Apr. 22, 1990, § 1, at 1, col. 1. In fact, realities of the labor market in an industrial-commercial world make it unlikely that the last possible moment of a worker's time would be purchased by an employer. Moreover, as age increases, the probability that the worker may claim total disability, using the injury as justification for not pushing himself or herself to work probably increases.

These subtle nuances between loss of full work-capital value at one end of the spectrum and malingering at the other are generally best left to the judgment of the community as reflected in the jury's verdict. In computing the full value of a tort victim's depleted work-capital the jury may consider a variety of factors that differ from plaintiff to plaintiff, such as past earnings, the marketplace value of an individual's skills, the availability of suitable employment, and average work-life expectancy as projected by government statistical tables. This value may be affected as a result of particularized evidence bearing on a plaintiff's pre-accident intentions and proclivities. For example, if the jury credited evidence that before being injured a plaintiff had intended to retire early, a reduction of the full value of an award would be justified under the doctrine of mitigation of damages, which requires tort victims to find alternative employment whenever possible. The award may be increased to the full or close to full value if, on the other hand, the jurors believed that a plaintiff was likely to work beyond that age at which the statistical tables or their common sense experience would normally predict retirement.

Where a jury verdict seems lopsidedly to favor one side or the other, the court has the obligation to require some equalization. This is such a case. Defendant's contention that there was no loss of earning capacity is unfounded. Nevertheless, for the reasons discussed below, defendants' motion for remittitur as to the award for future loss of earnings must be granted since an excessive award was made. Other adjustments are referred to below.

## I. Background

### A. The Parties' Claims

Earl claimed that he injured his right elbow in an August 29, 1984 accident and that he injured his ankle and reinjured his elbow in a second accident on December 13, 1984. Both accidents occurred while he was working on the Marion C. Bouchard, a tugboat owned by plaintiff's employer, defendant Bouchard Transportation Co. Plaintiff contended, and the jury found, that both accidents occurred as a result of the employer's negligence and the unseaworthiness of the tugboat.

As a consequence of the first accident, Earl claimed he was unable to work for two weeks. It was undisputed that he was unable to work for 11 days after the second accident. He returned to work approxi-

mately a month later, in early 1985, but claimed that his injuries eventually forced him to retire on May 16, 1985—three years and five weeks before his planned retirement at age 65.

Evidence adduced by defendants at trial indicated that plaintiff's intention prior to the accidents had been to retire in June of 1985 when he turned 62 years of age. Captain Kenneth Bekkelund of the Marion C. Bouchard testified that it had been common knowledge prior to Earl's December 1984 accident that he "was looking forward to retiring and talked of it frequently." Bekkelund testified that none of the crew had been surprised when plaintiff retired in May 1985. A member of the tugboat crew testified that Earl said nothing about being unable to work when he called to announce his retirement. Defendants also claimed that Earl had communicated his intention to retire to the family doctor treating him for the ankle injury even before the doctor had formally certified that Earl was "not fit for duty."

Plaintiff testified that he "would probably have retired ... at 65." He denied having spoken about early retirement plans to his captain or fellow crew members. With regard to his doctor, Earl acknowledged that while he may have "discussed the possibility" of retiring, he did not recall having informed his physician of any definite plan to do so. In his closing argument, plaintiff's counsel presented the jury with two possible scenarios: retirement at age 65 as plaintiff testified was his intention, or retirement at age 67, based on the average work-life expectancy of a then-62-year old man. In its charge to the jury the court presented the issue of retirement age as one of disputed fact.

### B. Remittitur

The $425,000 awarded for the loss of prospective earnings can be upheld only if the record contained evidence that plaintiff had the intention and ability to work past the age of 70, or, if not, could nonetheless have reasonably expected to receive an enormous—and unprecedented—increase in wages during the twilight years of his ca-

reer as a deck hand. The record supports neither proposition.

Accordingly, the court grants defendants' motion for a remittitur. *See generally Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984) (practice of remittitur is appropriately employed where court can identify error that caused jury to include in verdict a quantifiable amount that should be stricken). *See also Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978) ("The trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.") (*cited approvingly in Saleeby v. Kingsway Tankers, Inc.*, 531 F.Supp. 879, 888 (S.D.N.Y.1981) (Jones Act)); *Filkins v. McAllister Bros., Inc.*, 695 F.Supp. 845, 851 (E.D.Va.1988) (question of excessiveness of verdict is one left largely to discretion of trial court) (Jones Act). The final " 'damage calculation [appropriately] leaves in the judgment a portion of what the jury awarded.' " *Shu–Tao Lin*, 742 F.2d at 49 (citation omitted).

### II. Applicable Law

In this Jones Act case, federal law—that is, both judge-made general maritime law and federal statutory law—governs. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953); *Garrett v. Moore–McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). The Jones Act operates as both a personal injury and wrongful death statute and allows a seaman or his beneficiary to sue his employers for negligence. 1 M. Norris, *The Law of Maritime Personal Injuries* § 13 (3d ed. 1975). The Act extends to seamen the remedies made available to railroad workers under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq. See* Jones Act, 46 U.S.C.App. § 688.

As an aid to interpreting the liabilities and rights created by the federal admiralty and maritime compensation law, courts have frequently referred to the same general principles that underlie state tort law. *See, e.g., East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65, 106 S.Ct. 2295, 2298–99,

90 L.Ed.2d 865 (1986) (general maritime law is drawn from state and federal sources and is an amalgam of traditional common-law rules, modifications of those rules, and newly-created rules). The only constraint on this practice is the proviso that the state law must neither contravene a clearly established rule of general maritime law, nor impair the principle of national uniformity that underlies the federal maritime and admiralty statutes. *See, e.g., Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (allowing loss of consortium claim to be brought in maritime wrongful death action after Court had concluded 1) that state wrongful death statutes were nearly uniform in allowing such claims and 2) that the claim was not barred by any established and inflexible federal maritime rule); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409–10, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953) (states may at times supplement federal maritime policies, but may not deprive person of any substantial admiralty rights as defined in either congressional acts or Court's interpretive decisions); *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir.1981) ("[A]dmiralty law, at times, looks to state law, either statutory or decisional, to supply the rule of decision where there is no admiralty rule on point."); *Ingersoll Milling Machine Co. v. M/V Bodena*, 619 F.Supp. 493, 505 (D.C.N.Y.1985) (only in absence of established federal admiralty rule will state law govern) (citing *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 316, 75 S.Ct. 368, 371, 99 L.Ed. 337 (1955)); *Alvez v. American Export Lines, Inc.*, 46 N.Y.2d 634, 415 N.Y.S.2d 979, 389 N.E.2d 461 (1979) (allowing loss of consortium claim to be brought in personal injury maritime action because such claims are allowed under most states' personal injury tort law and are recognized under the federal law governing maritime wrongful death actions), *aff'd*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980); *Riley v. Agwilines, Inc.*, 296 N.Y. 402, 73 N.E.2d 718 (1947) (decisions of New York courts or statutes may not be considered in determining maritime torts where the state laws conflict with rules of liability established in federal courts).

■ Reference to general principles embodied in state tort law is similarly appropriate in determining damage recoveries under federal law. *See, e.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 527, 543–45, 103 S.Ct. 2541, 2553–55, 76 L.Ed.2d 768 (1983) (federal law controls damages issues in Longshore & Harbor Workers' Compensation Act case, but Court sought guidance from practice of state courts); *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 36 n. 6 (2d Cir.1980) (in determining relevance of inflation to federal law of damages, courts have considered general principles, without reference to any particular source of law), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); *Newburgh Land & Dock Co. v. Texas Co.*, 227 F.2d 732, 734–35 (2d Cir.1955) (Hand, J.) (courts may look to state law in interpreting measure of damages provided such reference does not significantly implicate congressional policy of uniformity of available remedies underlying federal maritime law); *Saleeby v. Kingsway Tankers, Inc.*, 531 F.Supp. 879, 880 (S.D.N.Y.1981) (in personal injury claim brought under Jones Act, court cites to variety of federal and state law claims to illustrate variables that should be considered by jury when calculating lost wages).

In a recent Jones Act case the trial court observed that "[d]amages in tort cases are designed to provide reparation for the injury caused [because] the 'cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty.'" *Filkins v. McAllister Bros., Inc.*, 695 F.Supp. 845, 854 (E.D.Va.1988) (quoting *Carey v. Piphus*, 435 U.S. 247, 254–55, 98 S.Ct. 1042, 1047–48, 55 L.Ed.2d 252 (1978)).

■ Neither the Jones Act nor the FELA includes any reference to the items of damages that are recoverable. Even before Congress enacted the Jones Act in 1915, however, the Supreme Court had interpreted a wrongful death claim brought pursuant to the FELA to permit recovery

for damages that "flow from the deprivation of the pecuniary benefits which the beneficiaries might have reasonably received if the deceased had not died from his injuries." *Michigan Central Railroad v. Vreeland*, 227 U.S. 59, 70, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913). Damages for the loss of prospective earnings therefore have been an integral part of recovery under the Jones Act from its inception. *See McCrann v. United States Lines, Inc.*, 803 F.2d 771, 773 (2d Cir.1986) (basic concept involved in calculating damage awards for lost wages of Jones Act claimant is to require tortfeasor to "put his victim in the same economic position that he would have occupied had he not been injured"); *Saleeby v. Kingsway Tankers, Inc.*, 531 F.Supp. 879, 888 (S.D.N.Y.1981) (Jones Act claimant who is successful in establishing liability is entitled to lost future earnings) (citing *Calcagni v. Hudson Waterways Corp.*, 603 F.2d 1049 (2d Cir.1979)). *Cf. Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1257 (2d Cir.1987) (observing that Congress had specifically provided for jury trial on legal issue of future loss of earnings in cases under Jones Act and FELA). A Jones Act claimant, like any other tort victim bringing an action pursuant to state decisional or federal law, is entitled to full compensation, including damages for loss or impairment of earning capacity. *See generally* 22 Am.Jur.2d *Damages* § 157 (1988); 4 F. Harper, F. James, Jr. & O. Gray, *The Law of Torts* § 25.8 (2d ed. 1986 & Supp.1989); 2 S. Speiser, C. Krause and A. Gans, *The American Law of Torts* § 8:27 (1985); 4 Restatement (Second) of Torts § 924, comments c & d (1979).

### III. Depletion of Work–Capital

"An injury that reduces the period of work-life expectancy deprives the worker of the value of work-capital." *In re Joint Eastern and Southern Dist. Asbestos Litigation (Rummo v. Celotex Corp.)*, 726 F.Supp. 426, 427 (E.D.N.Y.1989). Unlike the plaintiff in *Rummo*, the life-expectancy of the plaintiff in the case at bar was not shortened. His work expectancy was, the jury found, reduced. While fortunately not terminal, James Earl's injuries were nonetheless permanently and fully disabling and, according to the jury, prevented him from working.

Regardless of whether or not a plaintiff would have exercised the choice to work as long as he could have, he or she is entitled to damages "measured by the extent to which [plaintiff's] capacity for earnings has been reduced." Restatement (Second) of Torts § 924 comment c. *See also* 2 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 8:27, at 630. In effect, the " 'economic horizon of the [plaintiff] has been shortened because of the injuries.' " *Burke v. United States*, 605 F.Supp. 981, 999 (D.Md.1985).

■ There is no requirement that an injured plaintiff even be employed at the time of the accident in order to recover for impairment of earning capacity. *See generally* 2 S. Speiser, C. Krause, A. Gans, *The American Law of Torts* § 8:27, at 644; J. Stein, *Damages and Recovery: Personal Injury and Death Actions* §§ 59, 63 (1972 & Supp.1989) (citing cases); Restatement (Second) of Torts § 924 comment c (1979). *See also Gault v. Monongahela Power Co.*, 159 W.Va. 318, 223 S.E.2d 421, 426–27 (1976) (although plaintiff had ostensibly retired, he had intended to return to work as pipefitter and was therefore entitled to damages for impairment of earning capacity).

Earning capacity is determined by what a plaintiff "*could* have earned even if he or she never worked to that capacity in the past." 2 M. Minzer, J. Nates, C. Kimball, D. Axelrod & R. Goldstein, *Damages in Tort Actions* § 10.22[3][a] (citations omitted). As a California appellate court has observed, "[i]mpairment of the capacity or power to work is an injury separate from the actual loss of earnings." *Hilliard v. A.H. Robins Co.*, 196 Cal.Rptr. 117, 143, 148 Cal.App.3d 374 (Cal.App.2d Dist.1983) (citation omitted).

This principle is most clearly illustrated by cases involving injured students, homemakers, and infants. *See, e.g., Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 388 (2d Cir.1975) (in determining future earn-

ings of college-educated 25 year old woman who was unemployed when killed in plane crash, fact finder properly considered fact that she had been capable of working full-time for forty years until she was 65, had planned to attend law school and would have continued to work part-time for an estimated eight years while raising children); *Pucino v. Crete*, No. 89–644, 1990 WL 21303 (N.D.N.Y. Feb. 28, 1990) (LEXIS, Genfed library, Dist. file) (future earnings of aviation student killed while in last year of college are to be determined by wages he could have been expected to make as pilot over course of his pre-accident work-life expectancy); *Kavanaugh v. Nussbaum*, 129 A.D.2d 559, 514 N.Y.S.2d 55 (2d Dep't 1987) (injured infant's future earning capacity calculated using work-life expectancy of person having normal statistical life and work-life expectancies), *aff'd as modified on other grounds*, 71 N.Y.2d 535, 528 N.Y.S.2d 8, 523 N.E.2d 284 (1988); *Ward v. La. & Ark. Railway*, 451 So.2d 597, 608 (La.App. 2d Cir.1984) (injured high school student entitled to recover for loss of earning capacity even though she had not as yet entered work force); *Grimes v. Haslett*, 641 P.2d 813, 818 n. 3 (Ala.1982) ("The right of an injured homemaker to recover for impaired earning capacity regardless of whether she was employed before the injury exemplifies the distinction between an award for lost earnings and an award for lost earning capacity.").

At most, some courts have required that the plaintiff have been *employable* or *potentially* employable, rather than actually employed at the time of the accident. For example, in *Espana v. United States*, 616 F.2d 41 (2d Cir.1980), the court of appeals observed that tort victims such as housewives or students who, prior to injury, have not earned as much as they could in the marketplace, are entitled to recover damages for loss of full-time earning capacity. *Id.* at 43 n. 2. In contrast, the court found that a plaintiff who had attempted and was unable before his accident to find full-time employment was not entitled to full-time compensation. *Id.* at 43–44. *Accord Fraysier v. United States*, 566

F.Supp. 1085, 1090 (S.D.Fla.1983) (applying Florida law), *aff'd*, 766 F.2d 478 (11th Cir. 1985).

The conceptual difference between the loss of earning capacity and the loss of actual wages is also illustrated by cases holding that the injured party is not barred from recovering for loss of earning capacity even if he or she earns as much as or more than before the injury. *See, e.g., Jones v. Wal–Mart Stores, Inc.*, 870 F.2d 982, 990 (5th Cir.1989) (applying Texas law) (citations omitted); *Bochar v. J.B. Martin Motors, Inc.*, 374 Pa. 240, 244, 97 A.2d 813, 815 (1953) (tortfeasor not entitled to reduction in financial responsibility merely because, through fortuitous circumstance or unusual application on part of plaintiff, plaintiff's wages are as high or even higher than before accident). The rationale behind this seemingly paradoxical result is consistent with the concept of lost earning capacity, for, "[b]y having one less trade at his disposal the injured Plaintiff has a reduction in future employability." *Draisma v. United States*, 492 F.Supp. 1317, 1325 (W.D.Mich.1980). *Accord Jones*, 870 F.2d at 990.

■ Nor does the ability to recover for impaired earning capacity even where there is no actual wage loss necessarily undermine the doctrine of mitigation of damages. Under this doctrine, a Jones Act claimant, like other tort victims, has an obligation to mitigate damages where possible by finding other employment. *Williams v. United States*, 712 F.Supp. 1132, 1136, 1139 (S.D.N.Y.1989) (citations omitted); *Saleeby v. Kingsway Tankers, Inc.*, 531 F.Supp. 879, 891 (S.D.N.Y.1981) (court instructed jury that "plaintiff's recovery, if any, for a loss of past or future earnings must be reduced by the amount, if any, which you, the jury, find that plaintiff can or could have made had the plaintiff made a reasonable and good faith effort to mitigate his damages."). Nonetheless, the plaintiff who does so may still recover a reduced award provided the diminution of his or her work-capital is reflected in the smaller number of employment options available to that person as a result of injury. *But see Alferoff v. Casagrande*, 122 A.D.2d 183,

504 N.Y.S.2d 719, 721 (2d Dep't 1986) (student may not recover for diminution of earning capacity in intended profession as cosmetologist since post-injury job as receptionist paid higher salary).

In the case at bar, plaintiff's announced plan, as testified to by defense witnesses, to retire at age 62, if it had been credited, would have been strong evidence of malingering. It could have shown that in fact he had not lost any of his work capital— *e.g.,* the ability to earn money in the marketplace—and that he had refused or otherwise failed to mitigate his damages. It is clear, however, that the jury believed plaintiff to be completely disabled as a result of his accident, and thus exempt from the obligation to mitigate damages by continuing to work as a deck hand or by seeking other employment.

### IV. Determining Work–Life Expectancy

Courts have varied in their approaches to calculating work-life expectancy. The Supreme Court, discussing the calculation of future loss of income in the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.,* observed that

> [t]he lost stream [of income's] length cannot be known with certainty.... Given the complexity of trying to make an exact calculation, litigants frequently follow the relatively simple course of assuming that the worker would have continued to work up until a specific date certain.

*Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533–34, 103 S.Ct. 2541, 2548–49, 76 L.Ed.2d 768 (1983). *See, e.g., Andrulonis v. United States,* 724 F.Supp. 1421, 1517 & n. 604 (N.D.N.Y.1989) (court assumes, for convenience and in absence of statistical basis for either plaintiff's or defendant's proffer, that plaintiff would have worked to age 65).

■ In general "[t]he admissibility of evidence regarding future earning capacity is within the wide discretion of the trial judge." *Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742, 745 (2d Cir.1988) (Jones Act). For example, trial courts have considered the likelihood that economic downturns in a particular industry would have resulted in lower wages in future years, as well as the likelihood that a given plaintiff would have been impervious to such economic vicissitudes. *See, e.g., Pretre v. United States,* 531 F.Supp. 931, 935 (E.D.Mo.1981) (although defendant established that plaintiff would have been laid off due to his seniority ranking four years after being injured, court found he would have sought similar work and ordered him compensated for loss of earning capacity, "not merely for the loss of income from any particular job"). *Compare, e.g., Masinter v. Tenneco Oil Co.,* 867 F.2d 892, 899 (5th Cir.1989) (based on evidence of subsequent reduction in work force and in absence of evidence showing that longshoreman plaintiff would have been retained, it was not clearly erroneous for trial court to decide that plaintiff in future would have earned only 75% of his past earnings) *with Connecticut National Bank v. Omi Corp.,* 733 F.Supp. 14 (S.D.N.Y.1990) (awarding full compensation for future loss of earnings despite showing that there was a general loss of seamen's jobs after seaman's death where widow claimed that she and decedent would have moved to area where shipping industry was healthiest).

■ In the absence of a mandatory retirement policy, a wide range of evidence bearing on retirement is admissible in the discretion of the trial court. Evidence regarding the pre-accident intentions of the plaintiff is often highly probative. *See, e.g., O'Shea v. Riverway Towing Co.,* 677 F.2d 1194, 1198 (7th Cir.1982) (court credits 57 year-old former ship cook's testimony that she had intended to work until age 70); *Eich v. Metro–North Commuter R.R.,* No. 88–1720, 1989 WL 146792 (S.D.N.Y., Nov. 30, 1989) (upholding jury award of $1,166,-274.00 in lost future earnings to "energetic" 45 year-old railroad engineer on grounds that evidence entitled jury to find that, but for injury, plaintiff would have worked until age 70); *McGowan v. McGowan,* 136 Misc.2d 225, 518 N.Y.S.2d 346, 351 (Sup.Ct.1987) (in projecting date of retirement for purposes of calculating pension benefits, trier of fact should take into con-

sideration factors such as party's future intentions and mental disposition toward working until a later age), *aff'd and modified*, 142 A.D.2d 355, 535 N.Y.S.2d 990 (2d Dep't 1988); *Gault v. Monongahela Power Co.*, 159 W.Va. 318, 223 S.E.2d 421, 426–27 (W.Va.1976) (crediting retired plaintiff's claim that he had intended to return to work as pipefitter).

The weight given such testimony of a desire and ability to work long beyond the average is, of course, left to the trier of fact. *See, e.g., Kaylor v. Amerada Hess Corp.*, 141 A.D.2d 331, 528 N.Y.S.2d 845, 846 (1st Dep't 1988) (seaman not entitled to recover for future impairment of earning capacity despite stated intention to return to higher paying seagoing job when he currently held shore job and in recent years had worked primarily in shore jobs); *Rosenbaum v. Lefrak Corp.*, 80 A.D.2d 337, 438 N.Y.S.2d 794, 799 (1st Dep't 1981) (rejecting as a dubious and unsupported assumption, plaintiff's claim that he would not have retired at age 62, but would have continued to work as carpenter until age 72).

In circumstances where there is no particularized information regarding a plaintiff's pre-accident intentions or other relevant characteristics, there appear to be no established rules in this circuit. *Compare, e.g., Zavattoni v. Interstate Express, Inc.*, No. 88–4718, 1989 WL 156296 (S.D.N.Y. Dec. 18, 1989) (negligence case in which court found 61 year old victim of automobile accident to have one year work expectancy since he would have been *eligible* to retire at age 62) *with Andrulonis v. United States*, 724 F.Supp. 1421, 1517 (N.D.N.Y.1989) ("Absent a reliable statistical basis for [either party's opinion as to work-life expectancy], the court assumes that [plaintiff] would have worked until age 65 if not for his tragic accident.") (FTCA case). *See also Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 443 F.2d 76, 77–78 (2d Cir.1971) (in absence of other evidence bearing on work-life expectancy, defendant's request to charge jury that work-life expectancy of longshoreman could not reasonably be found to be in excess of 65 years was appropriate), *appeal after remand*, 471 F.2d 705 (2d Cir.

1972), *cert. denied*, 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 393 (1973).

Statistical charts, such as the mortality tables and work-life expectancy tables prepared by the United States Department of Labor, compile averages and are often deemed authoritative, particularly in the absence of contradictory particularized evidence. *See, e.g., Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir.1984) (district court was incorrect in basing work-life expectancy on assumption that Jones Act plaintiff, absent injury, would have worked until age 65 where no particularized evidence existed to contradict United States Department of Labor statistical averages assigning him a work-life expectancy of fewer years); *Freeman v. Harold Dickey Transport, Inc.*, 467 So.2d 194, 197 (La.Ct.App. 3d Cir.1985) (plaintiff failed to prove that, absent injury, he would have been physically able to work beyond actuarial work-life expectancy).

▮ These tables are not binding on the fact finder. *See Espana v. United States*, 616 F.2d 41, 44 (2d Cir.1980) (mortality tables do not constitute absolute guides, but are data to be taken into account in calculating basis for damages award in light of all the evidence; court was not clearly erroneous in concluding that, absent accident, plaintiff's work life would have ended early at age 60 due to preexisting degenerative back condition); *McWeeney v. New York, New Haven, & Hartford R.R.*, 282 F.2d 34, 35–36 (2d Cir.) (a refined computation of damages for loss of earning capacity would take into account not only life expectancy tables, but also "conditions unconnected with the accident that might have reduced plaintiff's expectancy below the normal term"), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); *McDonald v. United States*, 555 F.Supp. 935, 968 (M.D.Pa.1983) (where female plaintiff did not have children and, as result of illness probably could not have any, shortened work-life expectancy projected by U.S. Dept. of Labor table and based on assumption that women leave workforce to bear children, is not applicable); 1 *New York Pattern Jury Instructions—Civil* 2:290

(1974 & Supp.1989). Moreover, the statistical charts are updated on average every 10 years and therefore exhibit a lag in reflecting changing work and mortality patterns.

■ In the instant case the issue of plaintiff's retirement intentions was fully litigated. The jury obviously credited Earl's testimony. Unfortunately, it went far beyond that which could reasonably be inferred from the evidence. Even when viewed in the light most favorable to the plaintiff, the record does not support an award based upon a projected pre-accident work-life expectancy of 70 or more years—an assumption required by the jury award. Plaintiff's own testimony contradicts his claim that a statistical work-life expectancy of a 62 year old man—that is, a work-life expectancy of age 67—should be accepted. A retirement age of 65, on the other hand, has some support in the record and appears to be fair in view of all of the circumstances. It stretches the record as far as possible to favor the plaintiff and the jury's award.

## V. Calculating Damages

■ Once the injured victim proves that he or she could have been gainfully employed, it is necessary to show with sufficient certainty the amount of damages. More is involved in computing the value of the diminution of work-capital " 'than comparing the amount earned before and after the injury.' " *Burke v. United States,* 605 F.Supp. 981, 999 (D.Md.1985) (citation omitted). It has long been the practice in New York, for example, to allow juries to consider the possibility that an injured victim would have advanced through promotions and thus be entitled to a recovery higher than that indicated by an average of his past earnings. *See, e.g., Geary v. Metropolitan Street Railway,* 73 A.D. 441, 77 N.Y.S. 54 (1902), *aff'd,* 84 A.D. 514, 82 N.Y.S. 1016 (1st Dep't 1903), *aff'd mem.,* 177 N.Y. 535, 69 N.E. 1123; *Metz v. Great Atlantic and Pacific Tea Company,* 30 Misc.2d 258, 215 N.Y.S.2d 175, 181 (Sup.Ct. 1961) (permanent substitute school teacher had legal right to become permanent teacher and, despite lack of intent to do so, was

entitled to recover higher amount). The Supreme Court has observed, "[a]s in all damages awards for tortious injury, '[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience.' " *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 590, 94 S.Ct. 806, 817, 39 L.Ed.2d 9 (1974) (citation omitted). Nonetheless, the trier of fact must not be left to speculate and to unreasonably inflate an award.

In determining damages for the diminution in the plaintiff's earning capacity, courts have normally utilized an "oversimplified formula ... which seeks to determine what the [plaintiff's] earnings would have been had he survived in good health, multiplied by [plaintiff's] work life expectancy with the resultant dollar figure arrived at, then discounted to the present value." *Connecticut National Bank v. Omi Corp.,* 733 F.Supp. 14 (S.D.N.Y.1990) (Carter, J.) (wrongful death case brought by seaman's widow pursuant to Death on the High Seas Act, 46 U.S.C. § 761 *et seq.*). *Accord Williams v. United States,* 712 F.Supp. 1132, 1136 (S.D.N.Y.1989) (Jones Act). In cases such as that at bar, past earnings—in the absence of unusual proven circumstances—serve as a dependable and adequate guide to future loss.

Earl was employed full-time before the accidents and there was no indication that he would or could have "retooled" at the age of 62 to go into a higher paying field. Any speculation that he might have been the beneficiary of an increase in wages is in effect cancelled out by the not-insubstantial possibility that he had never intended to work past age 62.

### A. Computations

The reduced award was computed as follows, giving plaintiff every benefit of the doubt:

1) $105,000 was allowed for lost wages, based upon an average of $37,468.72 for five previous years, with a 25% agreed upon tax rate, making net loss of earnings $87,006.15. Fringe benefits were agreed on as $5,784.00 per year, or $17,908.15 for the three years and five weeks. The total

is $104,914.30, rounded off to $105,000.00. There was no proof of increases in future wage rates. No allowance for discount was made because the judgment was entered after the probable date of retirement. No interest was sought for delayed payment, except as indicated in 3), below.

2) Pain and suffering and lost pleasure awards were exaggerated. An award of $100,000 for five years past is allowed. Assuming a possible additional life expectancy of 14 years an additional amount of $280,000 is permitted. The total is $380,000.

3) Maintenance and cure and interest factors were computed without objection at a rate most favorable to plaintiff in the sum of $40,000. This amount included past and future medical expenses. *See Kratzer v. Capital Marine Supply, Inc.*, 490 F.Supp. 222, 229 (M.D.La.1980) (" 'Cure' is payment for medical, therapeutic and hospital expenses [up to that point where maximum cure has been achieved].").

The total award that could possibly be justified is $525,000.00. This sum seems excessive, but it allows maximum effect to the jury's exceptionally sympathetic verdict for the plaintiff.

Conclusion

Unless plaintiff agrees to a remittitur to $525,000.00, a new trial is granted.

So ordered.